(No. 11972.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FAYETTE PARKER *et al.* Plaintiffs in Error.

*Opinion filed June 20, 1918.*

1. CRIMINAL LAW—*when evidence of hostile acts is no defense to charge of murder committed during race riot.* On the trial of certain negroes for killing a policeman during a race riot, as the result of a conspiracy to kill any white person who might appear in the negro neighborhood, evidence that a conspiracy had been entered into by a number of white residents in the vicinity and acts of violence committed on negroes is not admissible.

2. SAME—*improper exhibitions in the court room should be objected to on the trial.* Defendants charged with murder committed during a riot should object at the trial to improper exhibitions of guns and shells which they claim had no connection with the case and should preserve the ruling of the court on the objection by a bill of exceptions, and the objection will not be considered by the Supreme Court where the matter is in the record only by way of affidavit made in support of a motion for new trial.

3. SAME—*a defendant should object to alleged improper statements in argument of prosecuting attorney.* A defendant who desires to assign for error in the Supreme Court that the prosecuting attorney made improper statements in his argument to the jury should call the matter to the attention of the trial court at the time and preserve the objectionable statements, and the· ruling thereon, in the bill of exceptions, and it is not sufficient to embody such statements in an affidavit filed in support of a motion for new trial.

4. SAME—*when stenographer cannot testify from notes taken at inquest.* To rebut the testimony of a witness at a murder trial who testified at the coroner's inquest it is proper to refuse to allow the stenographer who. took notes at the inquest to testify from her notes, where she is unable to swear whether the testimony she took down was in the language of the witness or of the coroner, who directed her what to take down and sometimes summed up the testimony in his own words.

5. SAME—*instructions as to reasonable doubt should be concise.* There is no better definition of the meaning of the words "reasonable doubt" than the words themselves and instructions on such subject should be brief and concise, but the mere fact that they are long and involved is not necessarily ground for reversal, even though they should not have been given.

DUNCAN, C. J., and CARTER, J., specially concurring.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding.

SAMUEL W. BAXTER, WEBB & ZERWECK, and J. G. Mc-HALE, (E. O. BROWN, and HOMER G. PHILLIPS, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, HUBERT E. SCHAUMLEFFEL, State's Attorney, C. W. MIDDLEKAUFF, JAMES A. FARMER, and F. E. BRITTON, for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Plaintiffs in error, Fayette Parker, O'Fanniel Peoples, George Roberts, Horace Thomas, Marshall Alexander, Dee Smotherman, Albert Hughes, Bud Townsend, William Palmer and Charles Foster, together with Guy Moore, Thomas Tackett and Lester Fowler, were indicted in the circuit court of St. Clair county for the murder of Samuel Coppedge. Moore, Tackett and Fowler were acquitted on the trial. Plaintiffs in error were convicted and each was sentenced to serve a term of fourteen years in the penitentiary.

During the month of June, 1917, there was considerable trouble in certain sections of the city of East St. Louis growing out of race prejudice. A situation finally developed that resulted in the race riots which occurred in that city later. At 12:10 o'clock on the morning of Monday, July 2, 1917, the police station of East St. Louis received a telephone message which resulted in Sergeant Samuel Coppedge and three other police officers, in uniform, and a newspaper reporter, going in an automobile to the corner of Tenth street and Bond avenue, in the city of East St. Louis. The officers went south on Tenth street and turned into Bond avenue, reaching there about 12:15 o'clock. As they turned into Bond avenue they met a body of negroes, numbering from 75 to 100, armed with rifles and shotguns, some of

284 – 18

the rifles being of the Springfield pattern with bayonets affixed. The automobile was brought to a stop and Sergeant Coppedge, addressing the crowd, said, "What is the trouble, boys?" One of the negroes replied, "None of your damned business." Coppedge then said, "We are officers," and pulling his coat back displayed his star. He then said, "We are here to protect all blacks as well as whites," whereupon someone in the crowd called out, "We don't want any of your damned protection; get out of here; get away from here." As the men assembled in the crowd were making threatening demonstrations, Coppedge ordered the driver of the automobile to move on. As the machine started away someone in the crowd fired a shot, which was immediately followed by a volley. Coppedge and another one of the police officers, Frank Wadley, were killed and another officer in the car was wounded.

The point most strenuously insisted upon by plaintiffs in error is that the verdict is contrary to the evidence. It is insisted that the conviction of plaintiffs in error rests entirely upon the testimony of Edward Wilson, which they claim is unreliable and not in harmony with that of the other witnesses, particularly as to the time of the shooting.

The evidence discloses that beginning early on Sunday evening, July 1, there was unrest and agitation on the part of the colored people in the vicinity of Tenth street and Bond avenue and south of there. This section of the city of East St. Louis is inhabited almost entirely by colored people. During that evening many colored people carrying arms were seen upon the streets, afoot and in automobiles. They traveled in small groups, and the testimony discloses that their intention was to assault and kill any white persons they might meet upon the streets. Between 11 and 12 o'clock three white residents of this section of the city, while returning to their homes from work, were assaulted and fired upon repeatedly and only escaped by running from their pursuers and hiding. It was this shooting that caused

a white resident of this portion of the city to telephone to the police station for help. The evidence clearly shows that there was an understanding or conspiracy among a large number of the colored residents to arm themselves and assault any white men who should come into this section of the city. It also clearly appears from the evidence that it had been pre-arranged that the colored people should assemble with their arms upon the ringing of a certain church bell in this section of the city. This bell rang for several minutes about midnight on that night, which was about the time the assault was made upon the three white men who were returning to their homes.

Edward Wilson, a colored man who had resided in the city of East St. Louis for seventeen or eighteen years and had been in business there, testified that he heard the church bell ring and he looked out of the door of his home and saw a large number of people congregated at Fifteenth street and Piggot avenue, which was near his residence. He testified that about fifteen minutes after the bell rang he went down to the corner of Fifteenth street and Piggot avenue, which is seven blocks from the corner of Tenth street and Bond avenue; that when he arrived there he saw Peoples, Foster, Alexander and Smotherman, each with a shotgun or rifle; that Roberts and Thomas were in an automobile with James Bayles and he could not see whether they had guns or not; that Parker, Hughes, Townsend and Palmer were there, but he could not state whether they had guns or not. He also testified that Moore and Tackett were in the crowd, and that Dr. Bundy, a negro dentist of East St. Louis, who was a leader among the negroes, also was there. He testified that he did not see Fowler there. Wilson further testified that some of the men whom he had identified stated that they had just shot into an automobile; that Peoples asked someone for a handkerchief to wipe the blood off his face, stating that one of the men who were shooting at the automobile missed it and hit him; that he heard Foster,

Alexander and Smotherman argue about shooting at the machine and heard them say they had shot into an automobile; that the circumstance of the shooting was discussed for a few minutes and then the crowd separated and scattered as if they were going to their homes.

It is insisted that Wilson's testimony is not credible as he fixes the time of the ringing of the bell and of the volley of shots which followed immediately thereafter as 11 o'clock instead of shortly after 12 o'clock, which was the actual time. Wilson was positive in fixing the time the church bell rang as 11 o'clock, but states that he did not have a watch nor look at a clock. He fixed the time by the blowing of a whistle at the Aluminum Ore Company plant, which always blew at 11 o'clock. He testified that the church bell rang and the shots were fired at Tenth and Bond about the time this whistle blew. It was shown by another witness who worked for the American Steel Company, which is located in the same direction from this section of the city of East St. Louis as the Aluminum Ore Company plant, that the American Steel Company whistle blows at 11:30 P. M. for lunch and at 12:15 A. M. to resume work. It is contended on the part of the People that Wilson was simply mistaken as to which whistle he heard. It is evident that Wilson was mistaken as to the time of the occurrence which he testified to, as the great weight of the evidence is that the church bell rang a little after midnight and that the volley of shots was fired at Tenth and Bond immediately afterward. The fact that Wilson was mistaken as to the time does not tend to discredit his testimony, as plaintiffs in error contend, but rather strengthens it. He is charged with having manufactured this whole story and with having been under the domination, if not actually in the pay, of various officers. The fact that he was mistaken in respect to the time of these occurrences and insisted that he was right in that respect tends to strengthen a belief in his sincerity, for if, as plaintiffs in error contend,

he was testifying falsely at the instigation of those interested in the prosecution his story would not have been left with this discrepancy.

Practically all the defendants presented alibis in their defense and all of them testified in their own behalf except Palmer and Tackett. Fowler was not directly connected in any way with the occurrence on the night of July 1 except by the testimony of one witness, who testified that he was acquainted with Fowler; that he had worked for the witness for two or three years, and that while the witness was within his house and the negroes were congregated in the street in that section of the city where the disturbance occurred he heard and recognized Fowler's voice in the crowd. This was the only direct evidence that Fowler was out of his own home that evening. He presented proof, which the jury undoubtedly considered worthy of belief, that he was at home, and his acquittal resulted. Peoples testified in his own behalf, and his testimony was corroborated by a number of others, that his mother had died on Friday prior to July 1, and on the evening of July 1 and during the whole of that night he was present in his own home, where a great many of his friends were attending the wake or sitting up with the dead body of his mother. He testified, and this is corroborated by other members of his family and by others who claimed to have been at the wake, that he was not out of the house at any time that night. Calvin Glassby testified that on Sunday evening of July 1, between 9 and 10 o'clock, he saw Peoples, Foster, Alexander and two other negroes at Fifteenth street and Piggot avenue and that Peoples had a shotgun in his hand. A. J. Stocker, a deputy sheriff of St. Clair county and on July 1 chief of detectives of East St. Louis, testified that he talked to Peoples and Smotherman, who told him that they were at a wake until about 10 or 10:30 o'clock that night and then went home. Alexander testified, and produced witnesses to corroborate him, that he went to bed at his home

on the evening of July 1 at 8:30 P. M. and remained in bed until he and his neighbors were aroused by the ringing of the church bell and the shooting. Foster also testified that he was at home and went to bed at 9 o'clock and remained there until after 12 o'clock, when he was aroused by the ringing of the bell and the shooting and the consequent confusion. Smotherman testified, and produced witnesses to corroborate him, that he was at the Peoples home at 9 o'clock and remained there until after the ringing of the church bell and the shooting at Tenth and Bond, when he went to a neighbor's home and remained there during the remainder of the night. It thus appears that while the witnesses Glassby and Stocker do not directly corroborate the testimony of Wilson, they do contradict the alibis relied on by Peoples, Foster, Alexander and Smotherman. Roberts testified, and produced witnesses to corroborate him, that he was in the city of St. Louis, Missouri, on the evening of July 1, 1917, and remained there until 10:45 P. M., when he went directly to his home in East St. Louis, arriving there about 12 o'clock. Fred Peleate, a white resident of this section of East St. Louis and the man who sent the message to the police department, testified that between 11 and 12 o'clock that Sunday night he saw Roberts at Twelfth street and Market avenue with a shotgun or rifle in his hand; that he stepped to his door and saw a large number of colored people congregated in the street; that among them was Roberts, and that Roberts jumped into the weeds; that shortly afterward he saw Roberts on Eleventh street, going toward Bond avenue. This witness also testified that he heard the shooting at Tenth and Bond, and a few minutes afterward a crowd of negroes came by the corner of Twelfth and Market, near which his residence was, and called to the man who lived on the corner; that this man came outside his house and someone in the crowd told him they had killed a "white son-of-a-bitch."

It is evident that the jury carefully weighed the evidence and did not arrive at their verdict as the result of prejudice or passion.   While each of the defendants sought to prove an alibi, an examination of this record discloses that there is ample basis for the conclusion of the jury that the alibis offered by Moore, Tackett and Fowler were substantiated and that the others were unworthy of consideration.   That there was a widespread conspiracy to do violence to any white person who should come into that section of the city on that night;  that the ringing of the church bell was a pre-arranged signal for the assembling of those in the conspiracy with whatever weapons they had;  that each of the plaintiffs in error was a party to the conspiracy and actively participated therein, and that this conspiracy resulted in the murder of Samuel Coppedge, is clearly shown beyond all doubt by the evidence.   The verdict is not contrary to the evidence.

It is complained that the court erred in refusing to permit the plaintiffs in error to prove a conspiracy on the part of the white residents of East St. Louis to assault and injure the colored residents.   The plaintiffs in error offered to prove the following facts:  That on May 28, 1917, a large body of men met in the city hall in the city of East St. Louis, and that it was agreed and understood by the members of that assemblage that the colored people should be run out of the city of East St. Louis;  that immediately thereafter colored men at different places in the city of East St. Louis were assaulted and beaten by large numbers of white men;  that that condition continued until July 1, 1917;  that on July 1, 1917, an inspection was made of the colored residence section around Fifteenth street and Market avenue, in said city;  that said inspection was made in the day time by a large number of white men in automobiles, and that on said day negroes in said section of the city were assaulted and beaten;  that their homes were fired into, and that at the time of the said inspection a large number of

white men were parading the streets of said city of East St. Louis around Fifteenth street and Market avenue; and that at about 10:30 o'clock P. M. on said day an automobile was driven hurriedly through the streets of the colored residence section of East St. Louis in the neighborhood of Fifteenth street and Market avenue and that the men in the automobile fired many shots into the homes of the colored people living in that section of the city. Objections were properly sustained to this proof. It was no defense to this indictment and no rebuttal to the proof on the part of the State to show, if it could be shown, that such a conspiracy had been entered into by a number of the white residents of the city of East St. Louis. Even if such unlawful acts had been committed, this would not have been justification for plaintiffs in error to enter into the conspiracy which they did, to wantonly kill any white person who might chance to go into that section of the city of East St. Louis. It does not appear from the evidence that plaintiffs in error and their associates had armed themselves for defensive purposes, only, even if that had been a proper matter to prove. It does appear, on the contrary, that they were armed for an entirely different purpose which was wholly offensive in its nature.

It is complained that it was error to exhibit a number of shotguns or rifles in the court room without the same having been identified or offered in evidence, and to exhibit a number of shells, including two which had been bisected or cut in two with a knife. No objection was made at the time of the trial to the presence in the court room of guns, if they were there, nor does the trial judge certify in the bill of exceptions that any guns or shells except those offered in evidence were in the court room. The matter is only in the record by way of an affidavit made by one of plaintiffs in error in support of a motion for a new trial. If an improper exhibition was made in the court room of guns and shells which had no connection with the case, the

attention of the court should have been called to it and a
ruling secured so that the matter could be properly pre-
sented by the bill of exceptions upon a review of the case.
*Deel* v. *Heiligenstein,* 244 Ill. 239.

It is also complained that the attorneys for the prose-
cution called attention to these shotguns and shells in their
arguments to the jury, and that Assistant Attorney General
Farmer improperly stated in his closing argument to the
jury and while contending that the evidence had proven the
guilt of the defendants: "Gentlemen, we are demanding
a conviction in this case. They are all guilty, and unless
there is a conviction there will be another race riot in East
St. Louis." These alleged improper remarks are not shown
by proper recital in the bill of exceptions but appear only
in an *ex parte* affidavit made by one of the plaintiffs in er-
ror and presented in support of the motion for a new trial.
It does not appear that any objection was interposed in the
trial court when the alleged improper remarks were made,
and consequently no ruling of the court with reference to
the propriety of the remarks was obtained. This matter is
therefore not properly before us for review. In *Mayes* v.
*People,* 106 Ill. 306, we held that if one on trial for a crimi-
nal offense desires to assign for error in this court that the
State's attorney made improper and prejudicial statements
in his argument to the jury he should call the matter to the
attention of the trial court at the time and embody the ob-
jectionable statements and the ruling thereon in the bill of
exceptions, otherwise this court cannot consider the assign-
ment of error, and that it is not sufficient to embody such
statements in an affidavit filed in support of a motion for
a new trial. As to the remark alleged to have been made
by Assistant Attorney General Farmer, we are of the opin-
ion that it was proper and legitimate argument and would
not be subject to objection. He was contending that the
proof showed these men were guilty, and in this connection
stated to the jury, as he had a right to do, that if they

turned them loose other lawless acts would no doubt be committed.

It is contended that the judgment should be reversed because of the act of the State's attorney in calling upon William Palmer, one of the plaintiffs in error, to testify. Foster and Alexander testified in their own behalf, and each was asked if he had not told Palmer on the night of July 1 to get his gun and go to Tenth street and Bond avenue to shoot white people. The defense rested after these two defendants had testified, and the State's attorney called Palmer to take the witness stand. One of the attorneys for the defense objected, and the court immediately ordered the jury to retire from the room. The situation being unusual, the court made inquiry and discovered that Palmer had talked with the State's attorney and had expressed a desire to testify. The court then asked Palmer if he desired to testify, and he stated that he did. His attorney then asked for time to counsel with him, which was granted. After counseling with his attorney, Palmer stated that he did not desire to testify. Under these circumstances it certainly could not be held that Palmer's constitutional rights had been invaded by the action of the State's attorney in calling him to take the witness stand. If a reversal could be secured under such circumstances then it would be an easy matter for a defendant in almost any criminal case to trap the prosecution in this way.

Complaint is made that two police officers were permitted to testify, over objection, that a sister of plaintiff in error Peoples, at the time the officers came to his home to arrest him, seized a shotgun which was afterward identified as Peoples' property, ran through the house with it and hid it under the back porch. This testimony was produced in rebuttal of the testimony of Peoples himself and was proper rebuttal.

Plaintiffs in error asked Wilson a number of impeaching questions in reference to the testimony he had given

before the coroner's jury. They attempted to impeach him by calling to the stand the stenographer who took the testimony heard before the coroner's jury and asking her to read her notes. It developed that the stenographer had not taken down the questions and answers verbatim nor written out the statements of the witnesses exactly as they were made. She testified that as the inquest proceeded the coroner directed her from time to time what to take down and what not to take down; that sometimes he would have a witness repeat a statement, and at other times the coroner would sum up in his own language the substance of the testimony which he desired her to take down in shorthand. She was not prepared to swear whether the testimony she had taken purporting to be that of Wilson was in Wilson's own language or in the language of the coroner. The court properly refused to allow her to testify from her notes.

It is finally objected that the jury were improperly instructed on the part of the People on the question of reasonable doubt. Six long and involved instructions were given as to the meaning of the words "reasonable doubt." We have frequently held that the object of instructions to the jury is to give the jury a concise statement of the principles of law which they should apply to the case and not an exhaustive treatise on those principles in detail. We have also stated that there is no better definition of the meaning of the words "reasonable doubt" than the words themselves. While the instructions given on this subject have been criticised and should not have been given, we are unable to perceive that the giving of them was so prejudicial as to warrant a reversal of the judgment.

There being no prejudicial error in the record the judgment of the circuit court is affirmed.

*Judgment affirmed.*

DUNCAN, C. J., and CARTER, J., specially concurring:

We concur in the conclusion reached by the court in this case that the judgment and sentence of the court be

affirmed. We do not, however, concur in all that is said and determined in the opinion of the court. In this State our statute does not define the degrees of murder and fix definite penalties for the various degrees of guilt. If the accused is found guilty of murder by a jury they shall fix the punishment by their verdict. Whoever is found guilty of murder in this State shall suffer the punishment of death, or imprisonment in the penitentiary for his natural life or for a term not less than fourteen.years. The design of our statute is that the punishment shall be proportioned to the turpitude of the offense, and any evidence having a direct and legitimate bearing upon that question should be allowed to go to the jury, as the duty rests upon them to determine not only the question of the accused's guilt, but also, if he is found guilty, the enormity of his crime and the amount of punishment that is fit and proper to be inflicted upon him. We therefore think the lower court erred in excluding the following evidence offered by plaintiff in error, the substance of which is given in the opinion of the court, to-wit:

"That on May 28, 1917, a large body of men met in the city hall in the city of East St. Louis, and that it was agreed and understood by the members of that assemblage that the colored people should be run out of the city of East St. Louis; that immediately thereafter colored men at different places in the city of East St. Louis were assaulted and beaten by large numbers of white men; that that condition continued until July 1, 1917; that on July 1, 1917, an inspection was made of the colored residence section around Fifteenth street and Market avenue, in said city; that said inspection was made in the day time by a large number of white men in automobiles, and that on the said day negroes in said section of the city were assaulted and beaten; that their homes were fired into, and that at the time of said inspection a large number of white men were parading the streets of said city of East St. Louis around Fifteenth street and Market avenue, and that at about 10:30

o'clock P. M. on said day an automobile was driven hurriedly through the streets of the colored residence section of East St. Louis in the neighborhood of Fifteenth street and Market avenue and that the men in the automobile fired many shots into the homes of the colored people living in that section of the city."

The evidence aforesaid is admissible in mitigation of punishment, only, and not as a justification or as an excuse for committing the crime. We do not here express the opinion that such evidence should be actually considered by the jury in mitigation of punishment in this case, but we do say that it was the province of the jury to consider it and to determine whether or not it should mitigate the punishment. With said evidence excluded the cause went to the jury upon the sole question whether or not the defendants were the guilty parties in the crime charged. If found guilty under the evidence the duty then simply devolved upon the jury of fixing their punishment, without any evidence in mitigation whatever. We think it was for the jury to say whether or not the killing of the deceased by the plaintiffs in error was a greater offense when done because of the conditions recited in the rejected evidence than if such killing had been done without any justification or excuse or grounds for provocation whatever. This conclusion we think is well sustained by the case of *Nowacryk* v. *People,* 139 Ill. 336.

We are further of the opinion that the specific remarks of the Assistant Attorney General objected to by plaintiffs in error and also quoted in the opinion of the court, to-wit, "Gentlemen, we are demanding a conviction in this case. They are all guilty, and unless there is a conviction there will be another race riot in East St. Louis," were improper. Such an appeal to a jury where the charge is the killing of a white man by a negro, or the killing of a negro by a white man, ought not, in our judgment, to be permitted. Its tendency is to stir up race prejudice in such cases and

to unduly urge a jury to a conviction. We therefore can not sanction the holding of the court that such an appeal may be made by the Attorney General or the State's attorney. However, as the verdict in this case was a verdict of guilty and for the lowest penalty fixed for murder, it is evident that the exclusion of the evidence offered in mitigation of punishment was not reversible error, as the jury could not have fixed a lower punishment. We are also of the opinion that the remarks of the State's attorney are not shown in the record to have affected the verdict of the jury and that it was not reversible error. We therefore think that the conclusion of the court was proper notwithstanding the errors aforesaid.