(No. 13366.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEROY N. BUNDY, Plaintiff in Error.

*Opinion filed December 21, 1920.*

1. CRIMINAL LAW—*what evidence is admissible against a conspirator.* To prove a conspiracy general evidence of its existence and of its nature may be admitted, and when the conspiracy is once established, everything said or done by any of the conspirators in execution of the common purpose is deemed to be said or done by every one of them and may be proved against each; but declarations of the conspirators are not admissible against a defendant not shown to be connected with the conspiracy.

2. SAME—*what evidence is admissible to explain defendant's flight.* A negro defendant who is on trial for the murder of a police officer, who was killed during a race riot, may, in order to explain why he left the State after the homicide, prove the riotous conditions directed by mobs against the people of his race, and may introduce any evidence tending to show that his flight was not from a consciousness of guilt but was consistent with innocence.

3. SAME—*what is proper notice to defendant before calling witness rests in discretion of court.* What is proper notice to the defendant before a witness is called to testify rests largely in the

discretion of the trial court, and where the witness is permitted to testify, after a hearing by the judge, as to whether the notice was given, the Supreme Court cannot say that there was an abuse of discretion by the trial court.

4. SAME—*prosecution should not be allowed two closing arguments.* A single closing argument purely in reply and not introducing new matter is entirely sufficient for the purposes of the prosecution in a murder trial, and where such argument has been made by an assistant Attorney General and the court has adjourned until the next day it is not proper to allow another attorney for the prosecution to make a further closing argument.

5. SAME—*when form of verdict does not render it void.* A verdict in a murder trial fixing the penalty of the defendant "at the penitentiary for his natural life" is not void for uncertainty in not specifying imprisonment, as the only punishment provided by law at the penitentiary is imprisonment.

6. SAME—*judgment will not be arrested because of insanity of juror after the trial.* It is not error to deny a motion in arrest of judgment based on the ground that one of the jurors became insane shortly after the trial, where there is no satisfactory evidence that he was insane during the trial.

FARMER, STONE and THOMPSON, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Monroe county; the Hon. J. F. GILLHAM, Judge, presiding.

T. M. WEBB, SAMUEL W. BAXTER, A. H. FRIDRICHS, and HUESTON & CALLOWAY, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, H. E. SCHAUMLEFFEL, State's Attorney for St. Clair county; ROY GAUEN, State's Attorney for Monroe county; C. W. MIDDLEKAUFF, JAMES A. FARMER, and A. C. BOLINGER, for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

At about 12:15 o'clock in the morning of July 2, 1917, Samuel Coppedge, a police officer of the city of East St. Louis, was killed by a mob of colored men on Bond avenue near its intersection with Tenth street, in that city,

and Leroy N. Bundy, plaintiff in error, was indicted, with others, for the murder. Other defendants were tried in the circuit court of St. Clair county and being convicted were sentenced to serve a term of fourteen years in the penitentiary, and the judgment was affirmed by this court. (*People* v. *Parker,* 284 Ill. 272.) The plaintiff in error was a dentist and had practiced his profession for many years and for the last six years had an office on Collinsville avenue, in East St. Louis, and he lived at the southeast corner of Seventeenth street and Bond avenue. In the early morning after the murder he left East St. Louis and went to the home of his mother-in-law in St. Louis and after about two weeks he removed to Cleveland, the home of his father, and opened an office there but was extradited and brought back for trial. His application for a change of venue was allowed and the cause was transferred to Monroe county, where he was tried in the circuit court and found guilty, and after motions for a new trial and in arrest of judgment were overruled he was sentenced on the verdict to imprisonment in the penitentiary for his natural life and sued out a writ of error from this court.

It was charged that there was a conspiracy of a considerable number of colored men living in East St. Louis to arm themselves and assault any white man who should come into the section of the city of East St. Louis inhabited almost entirely by colored people, and the fact to be first proved by the People was the existence of such a conspiracy. It was proved by practically the same evidence introduced on the trial of the other defendants and by this court held to be sufficient. That fact having been proved, it was then necessary to prove, beyond a reasonable doubt, that the defendant was one of the conspirators and so related to the mob at Tenth street and Bond avenue in carrying out the purposes for which the conspiracy was formed as to make him responsible for the murder. The evidence offered for that purpose consisted of the following testimony:

A witness who lived on Bond avenue, four doors from the defendant's home, said that in the last week in June she saw a red automobile stop in front of his place and two colored boys got out and each carried two guns into his place and came back and got into the machine and drove away. Edward Wilson, a colored man who was the principal witness on the former trial and whose testimony was recited in the case of *People* v. *Parker, supra,* testified to substantially the same facts on the trial of defendant, and said that at 11 o'clock a whistle blew and he heard some bells ringing and got up and went to Fifteenth street and Piggott avenue, where there were a number of people standing on the street, and he saw the defendant standing there but did not know whether he was armed, and heard one of the crowd say that they had shot into an automobile. A part, at least, of the business of Wilson was selling to colored people tickets which he called policies, connected with some sort of a wheel game, and a witness testified that shortly after the riot Wilson in his mother's house told the witness that he did not know anything against Bundy, but they beat him and he made the statement that he had seen him that night in order to get released from jail, and that was the reason he made the statement against him. Another witness testified that after the former trial in Belleville, in which Wilson had testified, he said that he did not know anything about Bundy, and that he had to swear against him because he had been beaten, and testified in order to get released or discharged from the charge himself. Another witness testified that at one o'clock in the morning of July 2, after the riot and shooting, Wilson came to the garage of the defendant and borrowed a jack to repair a tire, and said that he had been down to Fifteenth street and Piggott avenue and had seen a crowd down there and repeated a conversation which he said he heard there. Giving this information to the defendant was wholly inconsistent with his testimony that the defendant was there at

the time of the occurrence. The defendant testified to the same statement by Wilson, and all this tended materially to discredit the witness. Two witnesses testified that between 11 and 11:30 on the night of July 1 they saw a big black machine driven by the defendant followed by a red machine, both loaded with colored people, going south on Tenth street at Piggott avenue, and one said that the cars turned at the free bridge and came back and drove east on Piggott avenue to Eleventh street, which was the last he saw of them. Another witness said that he saw two machines pass along Tenth street, going south, near the mouth of Trendley avenue, at 11:15 or 11:30, and he recognized the defendant in the front seat of the front car. Another witness testified that he and two other persons were stopped by three colored men about 11:30 or 11:45 in the evening of July 1 and were told to get home, and they ran and the men commenced shooting at them; that he did not know the defendant but he looked like one of the men. It was proved by the official court reporter that this witness on the former trial said he could not identify the men; that they had their caps pulled down over their eyes and that he could not tell who the fellows were and did not know the three. There was nothing tending to prove that the defendant performed any act or said anything in furtherance or in connection with the conspiracy or common design to assault white men who came into the district inhabited by colored people.

This was all the legitimate evidence to prove connection between the defendant and the conspirators, and eliminating the testimony of Wilson as discredited, it consisted only of testimony that he was driving a car in the streets of East St. Louis the night of July 1 and that his car was followed by another car, both loaded with colored people. There was no evidence tending to prove that he was present or participated in any way with the mob when Coppedge was killed. At his residence he had an automobile service

station and also carried on a repair business, and he denied that any guns were carried into his place or that he had any participation whatever, directly or indirectly, with any conspiracy, and said he was absolutely and wholly free from the slightest connection with anything of the kind. He carried passengers for hire, and testified that on the night of July 1 he answered a call to furnish a car to Red's Place, on Fifth and Broadway, and went there and took four passengers,—Oscar Wallace, Frank Davis, George Lyons and a woman,—to White City, formerly called Priester's Park; that they remained there until a little after 11 o'clock, when they started back and went to Edgemont, about four miles distant, and from there to a saloon at Centerville station, about five miles southwest of Edgemont, where they stayed in a saloon for a time; that he went from there to Collinsville avenue, and in going down that avenue stopped at his office to put out the lights illuminating his sign. George Lyons was not in the State but the other men confirmed the testimony of the defendant. As the defendant was leaving White City on his return he was seen by four men who were in an automobile in the rear of the one he was driving. He was also seen by the head waiter and two other waiters, and when he stopped at his office on Collinsville avenue two witnesses saw him, and one of them, a doctor, talked with him. The whereabouts of the defendant from 9:30 in the evening until 12:45 o'clock in the morning was accounted for by a large number of witnesses, most of whom were white and who were not discredited in any way. The suggestion that these witnesses might have been mistaken as to the date and that instead of being Sunday evening, July 1, it might have been some other night, applies with equal force to the comparatively small number of witnesses who said that they saw the defendant driving around East St. Louis that night. The evidence that the defendant was not in East St. Louis covered the whole time that witnesses testi-

fied he was driving a car about the city, which was the only
credible evidence of any connection with the conspiracy.

The defendant is a colored man of good repute and high
standing and with much influence among the people of his
race, but these facts did not tend to show any connection
on his part with the conspiracy, which did not extend to
all of the 15,000 or 20,000 colored people who lived in
East St. Louis but was confined to a comparatively small
portion. It does not appear from the record that the de-
fendant was proved, beyond a reasonable doubt, to have any
connection with the conspiracy. General evidence of the
existence of the conspiracy and its nature was properly re-
ceived because a conspiracy can be proved in that way, but
that was only preliminary to proving the participation of
the defendant. When a conspiracy is once established,
everything said or done by either of the conspirators in
execution of the common purpose is deemed to be said or
done by every one of them and may be proved against each.
(*Spies* v. *People,* 122 Ill. 1; *Franklin Union No. 4* v. *Peo-
ple,* 220 id. 355.) Apparently for the purpose of charging
the defendant with acts or declarations of co-conspirators,
a witness testified that on the night of July 1 he was at
his home at 1722 Market street, which was not the place
where Coppedge was killed, and he was awakened by a shot
and saw an automobile pass; that there seemed to be peo-
ple in the machine, but he could not tell whether they were
colored people or not; that then there was a large red
machine came back, and as it went past some person said,
"Don't shoot! Don't shoot! Here comes Bundy!" This
evidence, if material, could only tend to prove that the de-
fendant was coming, and it was not competent proof of the
fact. The natural effect would be to connect the defend-
ant in some way with the conspiracy, but aside from that,
what was said did not tend to show that he was encouraging
the mob or the conspiracy because of what was said, "Don't
shoot! Don't shoot! Here comes Bundy!" Another wit-

ness testified that about 12 o'clock on the night of July 1
he was awakened and saw a crowd of colored people,
armed, coming from Tenth street onto Market street, and
one colored man said, "Bundy, we better turn this next cor-
ner; if we don't they will head us off;" that he saw a
man who looked like Bundy but did not know him person-
ally, and said, "I suppose it was him; everybody said it
was him." Evidently the witness supposed that the defend-
ant was there because everybody said so, but the evidence
was not competent to prove that fact.

The most incriminating fact was that the defendant
moved from East St. Louis the same morning of the homi-
cide and went to the home of his mother-in-law in St. Louis
and afterward moved to Cleveland. He testified that he
did this upon the advice of others and in view of danger
to himself by remaining in East St. Louis. He testified that
his attorney advised him on the morning of July 2 to leave
East St. Louis on account of the mob. He offered to prove
that while in St. Louis he saw and heard of a riot in East
St. Louis and was advised by his attorney that his life was
threatened, and upon that advice he went to his father's
home in Cleveland, Ohio. Objection to the offer was sus-
tained. The evidence for the People of the flight of the
defendant and that he was brought back by an officer was
competent on the theory that it tended to show guilt, but
the defendant had a right to show all the facts and circum-
stances and the riotous conditions directed by mobs against
colored people in East St. Louis. He had a right to show,
if he could, that the reason he went to Cleveland was not
from a consciousness of guilt but that his act was consistent
with innocence, and for that purpose to introduce any evi-
dence tending to explain the reason for leaving. (*Common-
wealth* v. *Goldberg,* 212 Mass. 88; 16 Corpus Juris, 553.)
He was only entitled to make such proof so far as it af-
fected his action, and the evidence was not offered, as it
was in *People* v. *Parker, supra,* as an excuse or justifica-

tion for the homicide. There were subsequent offers of evidence which perhaps were too broad, but the court erred in denying the defendant the right to offer evidence showing that his flight was not due to guilt but consistent with innocence. While the defendant was not entitled to go into the history of race troubles to prove which party was right or wrong, he had a right to show such existing conditions as would influence his action.

It is objected that the court permitted Earl Bateman to testify for want of notice to the defendant before the witness was called. The matter was largely in the discretion of the trial court, (*People* v. *Steinhauer,* 248 Ill. 46,) and there was a hearing at considerable length as to whether notice had been given and what it was, and we cannot say that the court abused the discretion.

It is also objected that the court allowed counsel for the People two closing arguments to the jury after the counsel for the defendant had been heard. The attorneys in the case agreed on four hours of argument for each side, and the time was divided on each side by the counsel to suit themselves, and three attorneys on each side argued alternately,—first one for the People and then one for the defense. After these arguments a closing argument was made by the assistant Attorney General and court adjourned over night. The next morning, against the objection of counsel for the defendant, the court permitted an attorney specially retained to assist in the prosecution to make a further closing argument for the People. The People were entitled to opening and closing arguments. In a criminal case the opening argument is intended to permit a statement of the case and of the law and the evidence and to uphold the right to a conviction. The argument for the defendant permits an answer to the plaintiff on the law and the facts and the presentation of the defense, in which counsel contends against the positions of the plaintiff and assumes

others of his own. The People in the closing argument are entitled only to reply to the arguments of the defendant and cannot introduce any new line of argument, and a single closing argument being purely in reply and not introducing new matter, is entirely sufficient for the purposes of the prosecution. The practice in this State is uniform and well settled, and the absolutely needless double argument in closing had a prejudicial effect and was contrary to the practice and unfair to the defendant. If the People could have two closing arguments they could have any number, and there is no good reason for changing the established practice.

It is objected that the verdict was void because after finding the defendant guilty and finding his age the verdict concluded, "We fix the penalty of the said Leroy N. Bundy at the penitentiary for his natural life." The only punishment provided by law at the penitentiary is imprisonment, and the verdict, and the judgment rendered upon it, could be pleaded in bar in another indictment for the same act and the verdict was not void. *Chambers* v. *People,* 4 Scam. 351; *Padfield* v. *People,* 146 Ill. 660.

Again, it is contended that the verdict was void because one of the jurors sitting in the trial of the cause was insane. He was insane shortly afterward, but the evidence did not justify the claim that he was insane during the trial, and the court did not err in refusing to arrest the judgment either on account of the form of the verdict or the mental condition of the juror.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

FARMER, STONE and THOMPSON, JJ., dissenting.