[No. 26957.   Department Two.   March 3, 1939.]

LULU N. PRESTON, *Respondent,* v. METROPOLITAN LIFE
INSURANCE COMPANY, *Appellant.*[1]

*Preston, Thorgrimson & Turner,* for appellant.

*Walter F. Fisher* and *Howard & Kindall,* for respondent.

ROBINSON, J.—In October, 1930, the appellant insurance company issued an accident policy to Curtis P. Preston in the principal sum of five thousand dollars, naming as beneficiary, in case of accidental death, his wife, Lulu N. Preston. On October 19, 1936, Preston was killed by the discharge of a shotgun in the hands of his fifteen year old son, "Billy" Preston. A claim was duly filed, and payment was refused by the insurance company, on the ground that the death was

[1]Reported in 87 P. (2d) 475.

not accidental, within the meaning of the policy. This action followed.

It was the theory of the defense that the deceased was intentionally shot by his son in defending his mother or himself, or both, from the insured's wilful, violent, and unprovoked assault, and that, accordingly, the death of the insured was not accidental. The plaintiff contended that the gun was accidentally discharged while the son was attempting to keep it out of the possession of his father.

The plaintiff, her son and daughter, all testified, in substance, that the deceased was ordinarily kindly; that the friendliest relations commonly existed between father and son, and that they were accustomed to work and hunt together in complete harmony; that Mr. Preston, however, became violent and cruel to all of them when under the influence of liquor; that, on the evening of his death, he came home intoxicated and became very abusive, and, finally, he backed Mrs. Preston into a corner, slapped her, and twisted her arm until she screamed in pain. She called out to her son to call the sheriff. Preston grabbed the telephone and almost tore it from the wall. He then returned to the attack, exclaiming, "Give me that gun and I'll shoot her." The boy grabbed a loaded shotgun which stood in the corner and said, "Not with this gun." Preston threw his wife to the floor, the gun was in some way discharged, and the charge struck Preston about two and one-half inches below the left nipple and ranged down to the kidney region, killing him instantly.

Upon cross-examination by Mr. Frank Preston, who conducted the trial for the defendant, Billy Preston, who, in his examination in chief, had denied loading the gun and having any recollection of pulling the trigger, admitted that, on the day following the shoot-

ing, he had made a statement in the presence of Mr. Covalt, the prosecutor of Whatcom county, the county sheriff, and Miss Frances Glazer, a stenographer employed in the prosecutor's office, concerning what occurred. He testified, in part, as follows:

"Q. I will ask you if at the same time and place, you didn't say this: 'He had her in front of him. If I shot I would have hit her. He pushed mother towards me and if I hadn't shot him he would have got me.' Did you say that? A. No. Q. You deny saying that? A. Yes. Q. Is that true? A. No. Q. It is not true? That didn't happen? A. No. Q. I ask you if at the same time and place, you didn't say this: 'He and I went hunting Sunday morning. I put the gun in the corner by the telephone, and the shells were hanging right beside it? A. Well, I don't remember saying that, but that is where the gun was. Q. What about the shells? A. Yes; the shells were there. Q. Hanging beside it? A. Yes. Q. That is true, then? A. Yes. Q. Then, at the same time and place, wasn't this question asked you: 'When did you pick the gun up?' and did you not answer: 'That was when he was twisting her arm, I picked the gun up and loaded it.'? A. No; I don't remember saying that. Q. You don't remember saying that, but is that true? A. No. Q. You deny that? A. Yes. Q. At the same time and place, did you not make this statement: 'I got scared when he ran for me.'? A. I didn't make that. Q. You didn't make that statement? A. No. Q. Whether you made it or not, is it true? A. No; it is not. Q. It is not true, nor did you make the statement, as I understand you? A. No. Q. I will ask you if at the same time and place, you didn't make this statement: 'When he was fighting mother he was mad, and when I grabbed the gun he was worse. He didn't say anything and then he started running for me.' Did you make that statement? A. No; not that I know of. Q. Is it true? A. No, it is not. Q. It is not true? A. No. Q. At the same time and place, was not this question asked you: 'When you loaded the gun, did he see you?' and did you not make this answer: 'I think when I got up he thought

I was going to telephone; when he saw me pick up the gun he pulled mother in front of him so if I shot I would hit her.' Did you make that statement? A. No; I did not. Q. Is it true? A. No. Q. And you say you did not make the statement? A. No. Q. I will ask you if at the same time and place, this question was not asked you: 'When he started running towards you, did he say anything to you?' and did you not make this answer: 'No. Mother was doing all the talking. She was yelling put down the gun.'? A. No; I don't remember saying that. Q. You don't remember saying that? A. No. Q. Is it true? A. No."

The only witness called by the defense was Miss Glazer. In answer to questions put by counsel, she testified that she was present when Mr. Covalt questioned Billy Preston on November 20th and took down the questions and answers, and that she had with her her shorthand notes and a typewritten transcription of them, whereupon the following occurred:

"Q. Now, using your notes, or your transcription of your notes to refresh your memory, will you answer these questions: I will ask you if, at that time, Billy Preston made this statement: 'I picked up the gun and my mother hollered not to shoot him'? MR. KINDALL: I don't think the witness should be allowed to read from her notes, or the transcription of her notes unless she will further testify that she personally remembers what answer to this question was given. THE COURT: The question was, using them purely to refresh her memory."

Mr. Kindall, for plaintiff, then asked for leave to examine the witness before the question was answered. We quote from such examination:

"BY MR. KINDALL: Q. Do you have any independent recollection whether or not he made such a statement? A. No. Q. After looking at your notes, then do you have any recollection that he did or did not make that statement? A. I will have to look at my notes first. Q. Will you do so? A. What was that question?

MR. PRESTON: The first question was whether or not he made this statement: 'I picked up the gun and my mother hollered not to shoot him.' Q. (By Mr. Kindall) Now, have you looked at your notes sufficiently? A. Yes. Q. I want to ask you one further question before you answer Mr. Preston's question. After having examined your notes, do you now have any recollection whether or not he made the statement questioned by Mr. Preston? A. Not until I look at my notes. Q. Do you now have any independent recollection? A. No. Just from reading what went on before. Q. I know, but are you relying solely upon your notes? A. Yes. Q. And it doesn't recall now to your mind that he said that? A. It doesn't recall it except for the fact that the notes are here and I am reading it, now. Q. But you don't recall it from your own recollection, aided by your notes? A. No."

The court sustained the plaintiff's objection, and Mr. Preston returned to the examination in chief:

"Q. Have you the transcript of the notes? A. Yes. Q. Does that give you an independent recollection? A. Well, what actually took place, no. After reading my notes, it doesn't give me an independent recollection. It is just the fact that I have my notes and I transcribed it, and so that is just the fact that it is there. Q. Do those notes and the transcription recall to your mind this interview taking place? A. Yes; of course. Q. And do those notes and transcription of those notes recall to your mind generally what was said? A. Well, a general outline of what was said and what took place. MR. PRESTON: I think that is sufficient, if the Court please. I renew the question. MR. KINDALL: I think it should be more definite than that."

Mr. Kindall then further cross-examined the witness, in the course of which she testified as follows:

"Q. But you have no independent recollection of what they said there, even after looking at your notes? A. Other than what my notes bring forth after I read them. Q. Yes, but that is from the notes alone? A. Yes."

Again, Mr. Preston resumed the examination in chief:

"Q. After you read your notes, does that then recall to you what happened, that is, what the questions and answers were, as you read them? A. Well, as I read my notes, it doesn't bring forth what took place. It is just so many questions and answers. You see, when we take notes we are intent upon what we do, and not the manner in which they are given or how they are given; it is up to us to take down what is being asked and what is answered, and how they may act or what they do we don't take any particular interest. Our mind is more on our shorthand. Q. I understand that, but does the reading of your notes, as you read them now, for instance, does that recall to your mind that those questions and answers were given? A. I am sorry, I don't know how to answer that outside of what I said before, that they were questions asked and answers given, and from my notes I can refresh my memory and that is about all."

Mr. Kindall again examined the witness:

"MR. KINDALL: Do you refresh your memory so that you then have an independent recollection of what was said? A. Well, I couldn't sit down and tell you what took place, no. If you ask me a question I can say yes, he said this, or didn't say that, because I have it in my notes. Q. (By Mr. Preston) Does it recall to your recollection that the question was asked? A. Well, because I have it in my notes. Q. Does it recall it to your mind? A. No, outside of the fact that it is here. This is what I go by, only, my book."

Mr. Preston then proposed a new question:

"Q. Now, at the same time and place, did he say this: 'He had her in front of him. If I shot I would have hit her. He pushed mother towards me and if I had not shot him he would have got me'?"

Objection was made, and Mr. Preston continued:

"Q. Do you have any independent recollection of that statement being made? A. Not any more than the

other question. Q. You would have to refer to the notes to know if that was done? A. Yes."

The witness further explained her condition of mind at length, as follows:

"A. As I said before, when you ask me a question I could not say yes, he said that, until I look at my book and read it over again. Then I can say, yes, he said that, because, it is here. Q. (By Mr. Preston) You see it is there? A. Yes. Q. Does it then recall to you the incident of the question being asked? A. No; it doesn't recall, because when they ask questions we are so intent on putting down the question and the answer, and then we are waiting for the next question and the answer, so I couldn't say that he said that until I did read my notes. Q. What we are getting at is, after you have read your notes, it comes to your mind what was said? A. No, outside of the fact it is here. MR. KINDALL: In other words, you don't remember them even after reading your own notes? A. I say I don't remember, no. Here it is in front of me. It is written down in ink. MR. PRESTON: Then do you remember, after reading it? A. *To the extent that I just got through reading it, yes.*" (Italics ours.)

Defense counsel then asked a great number of similar questions, based upon the foundation laid in the excerpt from the testimony first hereinbefore quoted, as to what Billy Preston said on the day in question. If his offers of proof had been accepted and the witness permitted to read her notes, it is quite apparent that her answers would have seriously impeached the evidence given by Billy Preston on behalf of the plaintiff. But in every single instance the witness said she could only answer the question from her notes, and not otherwise. At no time did the defendant offer the notes themselves in evidence or attempt to lay a foundation for such an offer.

The court's refusal to permit Miss Glazer to testify,

by refreshing her recollection through reading her notes, is the only error assigned on this appeal.

The ruling complained of was based upon the very simple and direct ground that Miss Glazer, as shown by her oft-repeated statement under oath, had no recollection to refresh. Defendant's counsel contended in the trial court, and contends here, that the fact that Miss Glazer recollected that questions were asked and answered furnished a sufficient basis. But that was an admitted fact and not the object of proof. Counsel was seeking to prove what young Preston said on that occasion, and as to this, according to her repeated declarations, the witness had no recollection whatsoever. She was no more competent to testify—from recollection—than any person selected at random from the audience in the courtroom would have been. That the trial court ruled correctly in refusing to permit the witness to appear to be giving evidence from refreshed recollection when she had no recollection, is a necessary conclusion.

Under the circumstances, it was open to the defense to prove by Miss Glazer that her notes correctly recorded what was said at the time, and then to offer the notes. Obviously, under the circumstances, they spoke for themselves and were the best evidence. *Davis v. Associated Fruit Co.*, 135 Wash. 614, 238 Pac. 629. Some courts, and possibly the majority, permit memorandums or the transcript thereof to be read to the jury on proof of their accuracy; and this, upon the theory that, if not accurately read, the adverse party has full opportunity to inspect the memorandum and correct the error. But we are satisfied that, in any case, the foundation must be laid by first submitting satisfactory proof of accuracy, and that this requirement is universal. 70 C. J. 600.

We find no such proof or offer of proof in this record.

In fact, it is apparent from the record that, had any attempt been made to introduce the notes or read their contents, on the theory that they constituted an accurate report of what was said in the prosecutor's office, it would have met with prompt resistance; for, during the preliminary examination of Miss Glazer, the plaintiff's counsel brought out that the witness did not feel competent to be a court reporter, and that, when she took notes in Mr. Covalt's office, she considered it unnecessary to take down everything the person being interrogated said, and did not do so unless Mr. Covalt asked her to take down the particular question and answer. If the notes had been offered in evidence, or if it had been sought to have them read, upon the theory that they constituted a correct and trustworthy transcript, the plaintiff's counsel would undoubtedly have pursued this inquiry further and might, conceivably, have prevented their introduction. *People v. Parker,* 284 Ill. 272, 120 N. E. 14. But we need not speculate as to that, for no such offer was made.

The judgment appealed from is affirmed.

BLAKE, C. J., MILLARD, BEALS, and SIMPSON, JJ., concur.