(No. 24896.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES PRICE, Plaintiff in Error.

*Opinion filed February 15, 1939—Rehearing denied April 5, 1939.*

138

ELLIS & WESTBROOKS, RICHARD E. WESTBROOKS, and CLAUDE W. B. HOLMAN, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and BLAIR L. VARNES, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

A jury in the criminal court of Cook county returned a death sentence against Charles Price for the murder of Nicholas Miller, who was killed during an attempted hold-up on the evening of March 30, 1936. Price was arrested November 26, 1937. He was convicted largely upon his written confession, supported by the testimony of Wayland Allen who said that he witnessed the killing and recognized Price. Motions to quash the indictment, for a new trial and in arrest of judgment, were all overruled when made. Defendant alleges the commission of many errors upon which he believes this court may properly base a reversal of the judgment.

To support his written motion to quash the indictment, Price said it was based solely upon the wholly incompetent

testimony of Allen before the grand jury. At the hearing on the motion Price offered to prove that Allen did not witness the killing, on the theory that a witness for defendant would say the killing was done by a party of three men, none of whom was Price. Clearly the evidence of Allen before the grand jury was competent. It was not necessary for the trial judge, in disposing of the motion, to adopt Price's theory of defense. This court will not inquire into. the evidence heard by the grand jury to determine if the evidence was sufficient to support the indictment unless all of the witnesses appearing before that body were incompetent. *People* v. *Bladek*, 259 Ill. 69; *People* v. *Duncan*, 261 id. 339.

Price complains that he was compelled to give evidence against himself before the grand jury. That body not only investigated the murder of Miller while it was in session, but also investigated the killing of Harold Rubin and the perpetration of sixty-four robberies. In some of the latter, Price was allegedly implicated and was indicted. The grand jury began its work on December 7, 1937, by investigating the death of Rubin. Price appeared before it at this time and told what he knew about the killing of Rubin. Before testifying, according to the People's evidence, he was informed of his constitutional right of refusing to testify, and presented with an immunity waiver, the contents and portent of which were explained to him before he signed it. The minutes of the grand jury show that the killing of Miller was not investigated until December 9, and there is no record that Price appeared before it on that day. Testimony of witnesses as to the whereabouts of Price on December 7 and 9 support the minutes. However, the indictment against Price, in the Miller case, had his name endorsed thereon as a witness. This occurred because a stenographer in the State's attorney's office became confused by the listing of Price's name as a witness in several cases for which she had to type indictments. The evidence is

conclusive that Price did not testify before the grand jury in the Miller case. The record is also bare of evidence, outside his own assertions, that he was coerced, intimidated or was promised immunity or special consideration if he would testify before the grand jury in the Miller investigation. The allegation that he was compelled to give evidence against himself is not sustained by the evidence.

Objection is made also that the names of the witnesses on the indictment were not endorsed thereon in the handwriting of the foreman of the grand jury. The foreman properly discharges his duty when he observes that the names of the witnesses are properly noted on the indictment, regardless of whether he writes the names or has it done. *Bartley* v. *People,* 156 Ill. 234; *People* v. *Corder,* 306 id. 264.

Section 1 of the Jury Commissioners' act (Ill. Rev. Stat. 1937, chap. 78, par. 24) provides that political party affiliations shall not enter into the selection of the jury commissioners. Defendant argues that because two of the commissioners belong to the prevailing political party and the third to the minor party, the appointing judges disregarded this statutory requirement, and that a grand jury drawn under their supervision is illegal and the indictment is void. Even if such a collateral attack could be made upon the right of the commissioners to hold office, the facts here do not show a disregard of the statute.

The chief justice did not err in directing the sheriff's deputy to pick two men from a supplementary panel of jurors when only twenty-one men reported to the court for duty as grand jurors. Defendant suffered no harm because twenty-three names were drawn in the first place. Sixteen men are sufficient in numbers to constitute a grand jury and twelve of them may return an indictment.

Section 8 of the Jury Commissioners' act (Ill. Rev. Stat. 1937, chap. 78, par. 31) requires that jury lists be prepared in a manner that will insure, as near as may be, proportional

representation of the whole electoral body, "in respect either of their occupations or of the particular localities wherein they reside:" A question is raised here whether the commissioners, in selecting persons for grand jury service, disregarded this requirement by the skipping over localities where negroes reside in overwhelming proportions. Price is a negro and he claims that members of his race have been deliberately excluded by the commission as grand jurors in Cook county and that educational qualifications have been applied to accomplish this purpose. The evidence does show that the grand jury which indicted Price did not have a negro on it.

The record establishes that in order to acquire a list of electors from which names of prospective grand and petit jurors may be obtained, the jury commissioners, every four years, secure the names of all registered voters in all wards and precincts of Chicago from the election commissioners, and the registered voters in Cook county outside Chicago, from the county clerk's office. The names of electors over sixty-five years old and all who are females are stricken from the lists. After that, the names in the poll lists are arranged according to streets; from every poll list, every tenth name on every street throughout Chicago and the country towns is selected. The names selected from Chicago are then classified according to wards and precincts and the latter are arranged numerically. Those from outside Chicago are arranged alphabetically. Each week not less than 1200 names of persons are selected by assistants in the office of the commissioners and to each a questionnaire is sent. Prospective grand jurors are not selected on a proportionate basis of business or profession, but defendant failed to show that selections are not made on a basis of residence, or wards lived in. No selection is made on a proportionate basis of townships in the county. The poll lists acquaint the commissioners within what ward and precinct a prospective grand juror lives. The second ward in

Chicago has shown about eighty per cent negro population during the past five years; the colored race also predominates in the third ward. The suburban city of Evanston has a large negro population; how much was not disclosed, nor was the negro population of the third ward in Chicago given. On the basis of returns from the national election of 1936, the second ward had a voting population of between forty and forty-five thousand. Between eighty-five and ninety per cent of these were negroes and over one-half of this number were males. The lists in the commissioners' office would not show what number of persons from the second and third wards had been certified for grand jury duty, nor would such lists show whether any certified person was a negro.

Persons placed upon the lists from which prospective grand jurors are to be selected are examined in the first instance by some of the personnel in the commissioners' office and later by the commissioners. Their qualifications are ascertained in an endeavor to eliminate those physically and mentally unfit. The records in the commissioners' office do not contain any information as to the number of negroes certified to the criminal court for grand jury duty within the past ten years. During the course of their examinations the commissioners have the opportunity of determining if the person before them is a negro. Only men passed by the commissioners as qualified have their names placed in the grand jury box for drawing. The questionnaires do not contain a space wherein the race of the person receiving one can be indicated. One witness testified for defendant that he had seen all the grand juries in Cook county during the past five years and he had seen only one or two negroes on them during that period. Defendant also introduced in evidence a book containing the names of all persons certified to the criminal court as members of the grand jury panels between November 3, 1931, and December 8, 1937. It was stipulated that this record would

show only four names drawn for that service from the second ward. The foregoing covers the salient features of all the evidence introduced by defendant to support his charge of racial exclusion.

In *Carter* v. *Texas,* 177 U. S. 442, 44 L. ed. 839, defendant alleged in his motion to quash that negroes were excluded from the grand jury because of race and color. The court would not allow the introduction of evidence to sustain the allegation and overruled the motion. The necessary conclusion was that defendant had been denied a right duly set up and claimed by him under the Federal constitution. The case is not applicable upon the facts here, for the trial judge, in the present case, permitted defendant to place upon the stand every witness he produced in support of this phase of his motion to quash. In *Neal* v. *Delaware,* 103 U. S. 370, 26 L. ed. 567, discrimination was brought about by administrative officers. On the question of unconstitutional discrimination the trial court refused a full hearing to defendant. No negro had ever been summoned as a juror in the courts of Delaware, where at the time there were 150,000 whites and 26,000 negroes. The opinion of those officers that negroes, because of low degree of intelligence, experience or moral integrity, were unfit to sit as jurors, was a violent presumption not warranted by the facts. The holding cannot apply here, because defendant has not presented any facts respecting the comparative numbers of negroes and whites in Cook county, nor has he shown that the jury commissioners regard the negroes of Cook county unfit to sit as grand jurors. Moreover, the present case is not one of absolute exclusion. Defendant also claims that *Lee* v. *State,* 163 Md. 56, 161 Atl. 284, is closely parallel to the facts in his case. Negroes there had not been summoned for grand jury service for many years. It was held that such proof showed negroes were excluded on account of their race. An officer testified that he wanted to get high-class jurors and he just did not consider negroes

at all, although he admitted there were negroes who possessed the necessary qualifications. It is clear the selecting official allowed his personal feeling toward the colored race to motivate his actions. There is nothing persuasive about this case, for within the past five years negroes have served on Cook county grand juries and defendant has not shown that the jury commissioners have allowed their personal feelings to sway them in qualifying persons for grand jury service. The case cited holds that whether negroes have been excluded is a question of fact and the burden of proof is upon the party sustaining the affirmative. (*Martin* v. *Texas*, 200 U. S. 316, 50 L. ed. 497.) Another case cited, *Bonapart* v. *State*, 65 Fla. 386, 62 So. 206, must also be distinguished from the case before us on the facts. There the negro population of the county outnumbered the whites and no negro had ever been selected for jury service by the particular officer charged with the duty. It was a clear-cut case of discrimination.

Final reliance is placed by defendant on the well-known *Scottsboro case*, *Norris* v. *Alabama*, 294 U. S. 587. The males in the county over twenty-one numbered 8801 of whom 666 were negroes. In over seventy years, no negro had served on a grand or petit jury. The Supreme Court considered this a *prima facie* case of discrimination, supplemented by the direct testimony that certain negroes, over thirty in number, were qualified for jury duty. The court held this to be discriminatory and that the motion to quash the indictment should have been sustained. But an entirely different situation confronts us in the present case. Here no *prima facie* case of discrimination has been established, for defendant's inquiry only covered the last five years and in that time negroes had served on the grand jury. He has also failed to furnish sufficient evidence from which we might determine the relative proportions of whites and negroes eligible for jury duty in Cook county. He was not denied the privilege of making this proof. He was

unable, or at least failed to show, that names of negroes were deliberately kept from the box from which grand jury panels were drawn. If discrimination was made against negroes, it was done by the jury commissioners and defendant did not see fit to place them on the stand. Defendant did not produce, nor endeavor to produce, any evidence of specific negroes being qualified for grand jury duty. The holding in *Norris* v. *Alabama, supra,* is not binding or even persuasive under these circumstances. Because defendant failed to sustain the burden of proving unconstitutional discrimination we are unable to say that such discrimination was practised in Cook county. The trial judge, therefore, did not err in overruling the motion to quash the indictment on this ground.

The same can be said of the charge that the jury commissioners neglected their statutory duty of insuring proportional representation on the grand jury list on the basis of residence. The burden was on defendant to prove this and he has failed to do so. The record does show that four names appeared on the grand jury lists from the second ward within a given space of time, but such facts were not presented as would enable us to say that proportional discrimination violative of statutory requirements had, or had not, been accomplished.

A fatal variance is charged against the indictment which alleged Miller was shot March 30, 1936, and died March 30, 1937, when the proof shows he died within a few hours after the shooting. This question cannot be raised here for it was not raised in the trial court. *People* v. *Ascey,* 304 Ill. 404.

Defendant's claim that incompetent evidence was admitted over his objections and competent evidence offered by him was excluded is not followed through with any particulars. He has failed to point out what incompetent evidence was admitted or what competent evidence was excluded; he advises us to inspect the abstract for those

errors. Under these circumstances, we will not search the record to find matters to support such an assignment of errors. *People* v. *Kozel*, 303 Ill. 112; *People* v. *Newcom*, 318 id. 188.

The trial judge is charged with having unduly limited defendant in his examination of two talesmen, neither of whom was accepted as a juror. The written motion for a new trial alleged the trial court erred in refusing to excuse certain jurors for cause on request of defendant. The abstract shows one of the prospective jurors was peremptorily excused by defendant, but does not show whether the other one was excused for cause or peremptorily. The written motion for a new trial was not specific enough on this, and we must hold, under the circumstances, that defendant waived this alleged error for purposes of review. (*People* v. *Fox*, 346 Ill. 374; *People* v. *Amore*, 369 id. 245.) Moreover, defendant has not shown that any prejudice or embarrassment resulted to him from this source.

After Price's arrest early in the morning of November 26, he was taken to the police station and interrogated. In an effort to avoid his confession, when its admissibility was being inquired into by the lower court, he testified that four police officers, whom he named, and about six others whom he could not identify, asked him what he knew about the Miller and Rubin cases and the many robberies that had occurred. He denied all knowledge of those events. Upon this denial, he said he was given a beating for about fifteen minutes, and was cursed and vilified. Later that morning he said he received four other beatings before he weakened, about noon, and informed his attackers he would tell all he knew. He told them he knew nothing about the Miller murder, but the questioning continued for many days. He was finally interviewed by an assistant State's attorney concerning the Miller and Rubin cases and his answers were taken down. He said a police officer promised to see that he "got a break;" that he would only get one to fourteen

years on one of the charges and not be prosecuted on the rest; that probation would be secured and employment at a filling station obtained, and that, a short time before he was taken before the grand jury to testify, he signed a written confession, as he had promised to do. The only testimony anywise supporting his statement came from his wife, who said his forehead was not marred by a bloody scar when arrested, but when she visited him on the afternoon of the same day, she noticed such a mark on him. All the police officers identified by Price as his attackers and inquisitors testified. They all specifically denied every act attributed to each of them by defendant, except that they questioned him every day over a course of days. None of them, according to their testimony, at any time ever struck, kicked, slapped, cursed or vilified him, or held out to him any hope of mitigation of punishment, probation or promise of employment, in order to get him to confess. They said Price was not believed to be connected with the killing of Miller until about 5:30 P. M., on November 30, when he voluntarily told officer Brennan about it. On this record, the lower court did not err in admitting the confession in evidence as his free and voluntary act. Price contradicted himself at times when he said he could not identify his attackers because he could not see them, as he had covered his face. Further doubt is cast upon the truthfulness of his story when he said the confession was signed by him a short while before he appeared before the grand jury. The confession was in fact signed by him on December 9, two days after he appeared before that body. When he was arrested on November 26, the police were not aware that he was involved in the killing of Miller and he was arrested for other reasons. His connection with that crime was not known or suspected until the evening of November 30, four days after the time when he said the confession was beaten from him. *Brown* v. *Mississippi*, 297 U. S. 278, has been cited to us, but the case is not applicable, for the evi-

dence here shows that the confession of the Miller killing was not extorted from defendant but was in fact his free and voluntary act, given without hope of reward or mitigation of punishment.

Exception is taken to the action of the trial court in first hearing defendant testify that the confession was involuntary and then hearing the side of the People. He says this placed the burden of proof upon him to show the confession was involuntarily made. Defendant is confused between the burden of proof and the order of proof. The court simply reversed the order of proof and kept the burden upon the People to establish the confession as his voluntary act. The proceeding was without the view and hearing of the jury and he was not harmed by this reversal of the order of proof to which he made no objection.

At the request of the police officers, Price reenacted the attempted holdup and shooting of Miller at the scene of the crime and explained how he did it. Testimony of this was properly admitted in evidence, even though some of the same facts were related in the signed confession and thus had a cumulative effect. The written motion for a new trial did not save this point for review but what we have said disposes of it anyway.

The allegation that the indictment was void because it did not allege, in the language of the statute, that deceased was, "In the peace of the People,"·at the time he was shot, is not borne out by the record. Count one of the indictment in part reads: "* * * Made an assault on and upon the body of one Nicholas Miller who then and there was in the peace of the People of said State of Illinois." That allegation is sufficient.

It is urged the evidence for the People is so unreasonable, improbable and unsatisfactory, in the light of the evidence for the defense, there is a reasonable doubt of defendant's guilt. The evidence of the People consisted of the confession, the reenactment of the crime and the testi-

mony of Wayland Allen, who claimed to be an eye-witness and subsequently identified Price. In addition to his own testimony, defendant relied chiefly upon Clarence Jetter, who lived next to the vacant lot in which Miller was killed. Jetter testified, in substance, that about 7:45 P. M., on March 30, 1936, he walked from his kitchen to his bed-room when he heard two shots fired; that he looked out of a window and saw a man shot down at the street curb; that three dark-skinned negroes were running southeast across the vacant lot. The witness went to the body, then returned home and called the police. According to this witness, Price was not one of the three negroes. He informed the police that he had witnessed the shooting and subsequently testified at the inquest. The stories of Jetter and Allen do agree in one particular. Allen, immediately before the shooting, saw two negroes walking rapidly south on Michigan avenue. He passed them when they got to the corner. Allen went east on Fifty-second street about twenty or thirty feet when he saw two men in the vacant lot across the street. He heard a shot and one of the men ran toward the northeast corner of Fifty-second street and Michigan avenue. Of the two men in the lot, one was white and the other a negro. Allen heard a second shot and the man who was running fell; this was the white man. According to Allen, the total number of men near the scene of the shooting, excluding himself, numbered four. Jetter accounted for four men, the three negroes and Miller. The jury had sufficient warrant to believe that Allen was telling the truth as he was closer and in better position to see what occurred immediately prior to and after the shooting. Jetter said it was dark but he could see well enough to know the three men were dark-skinned negroes. All of them, he said on cross-examination, wore dark overcoats, either blue or black. He remembered testifying at the inquest, where he said it was too dark to identify the men. He could not

describe any more of their apparel, except that one man wore a light hat and all wore gloves.

On many material points the evidence is in hopeless conflict. The jury was placed in this situation; if it believed the whole story told by Jetter, it would have to disbelieve the confession, the reenactment and explanation of the crime as made by defendant, the testimony of all police officers charged by defendant with beating him and the testimony of Wayland Allen. Assuming the stories of Jetter and Allen were canceled out by the jury, there remained the damning evidence of the confession and the subsequent reenactment of the crime. Simply because the jury, whose duty it is to determine credibility of witnesses and weight of testimony, chose not to believe the testimony of Price and his witnesses does not, in itself, warrant a reversal of the judgment. (*People* v. *Geisler,* 348 Ill. 510.) The proof must be so unsatisfactory as to justify us in entertaining a reasonable doubt of defendant's guilt. (*People* v. *Martellaro,* 281 Ill. 300; *People* v. *Thompson,* 321 id. 594.) Careful perusal of the evidence in this case leaves in our minds no grave doubt of defendant's guilt, and convinces us that the verdict was not the result of passion or prejudice. Under these circumstances we cannot reverse the judgment upon the evidence. *People* v. *McPheron,* 354 Ill. 381.

Objection is raised because certain instructions tendered by defendant were not given. Comparison of such instructions with those given shows that the latter accurately and fairly instructed the jury and covered the ground encompassed by the refused instructions. Given instruction three informed the jury: "If you believe from the evidence that any witness has wilfully sworn falsely to any material matter in the case, you may disregard the entire testimony of such witness except in so far as it may be corroborated by other credible evidence and by facts and circumstances in evidence." It is argued the word "corruptly" should

152

have been inserted after "falsely"—that only false testimony corruptly given may be disregarded. The given instruction was sufficient and the cases cited by defendant do not sustain his point. Other objections to given instructions 12, 13, 16, 18 and 19 are not meritorious. The trial court refused to give a tendered instruction on manslaughter. This cannot be criticized for defendant, if guilty, could only be found guilty of murder under the evidence. To have given the manslaughter instruction would have been error (*People* v. *Payne,* 359 Ill. 246) and would not have been in harmony with the defense made in this case.

Some remarks of the trial judge made during the course of the trial are criticized on the ground they exhibited to the jury his fixed opinion of defendant's guilt. Remarks of the State's attorney made during the opening statement and the closing argument are also pointed out as prejudicial. We have studied these numerous allegedly harmful statements and find they do not contain anything of serious or prejudicial nature such as would warrant a reversal. In the light of the whole record, they were of little consequence and could not have caused the jury to turn against defendant. In our opinion, defendant Price received a fair and impartial trial and his guilt was established beyond a reasonable doubt by evidence properly placed before the jury.

The judgment is affirmed and the clerk of this court is directed to enter an order fixing April 14, 1939, as the date on which the original sentence of the criminal court of Cook county shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the sheriff of Cook county.

*Judgment affirmed.*