(No. 29837.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JULIUS WEISBERG, Plaintiff in Error.

*Opinion filed January 22, 1947—Rehearing denied March 19, 1947.*

WM. Scott Stewart, of Chicago, for plaintiff in error.

George F. Barrett, Attorney General, and William J. Tuohy, State's Attorney, of Chicago, (Edward E. Wilson, John T. Gallagher, Melvin S. Rembe, Joseph A. Pope, Edmund H. Grant, and John M. Long, all of Chicago, of counsel,) for the People.

Mr. Chief Justice Gunn delivered the opinion of the court:

Plaintiff in error, Julius Weisberg, otherwise known as Dolly, was indicted in the criminal court of Cook county for the murder of Joseph McKnight, which occurred on October 23, 1945. Upon trial he was found guilty of

murder by a jury and sentenced to death, and motions for a new trial and in arrest of judgment were made and overruled, and judgment and sentence of death entered on the verdict.

The plaintiff in error, hereafter referred to as defendant, contends such error was committed during the trial of the case as to require reversal. The substantial facts disclose that defendant and the deceased were slightly acquainted. On the evening of October 23, 1945, they met at the bar in the Regent Room located at One North La Salle Street, in the city of Chicago. The bar runs north and south, and is separated from the dining room to the east by ribbed glass. At the south end of the bar it curves around to the wall, and at that point there is an opening underneath to go behind the bar. The top part of the bar raises for this purpose. At the extreme north end of the bar there is also a place where the top part of the bar may be raised to get behind. The entrance to the bar is off of Madison street at the south end of the room, through a revolving door. The bar is about fifty feet long, and there are stools along the entire length of the bar.

About eleven o'clock in the evening the deceased and Weisberg met near the gate or opening at the north end of the bar. Previous to that time McKnight had been at the south end of the bar talking with the manager concerning their going out for dinner. McKnight was a large man, weighing in the neighborhood of two hundred pounds, and the defendant about one hundred fifty-five or one hundred sixty pounds. They were both somewhat intoxicated when they got together towards the north end of the bar, and they commenced to argue about the respective abilities of their nationalities, and the ability to make money. According to Weisberg he asked McKnight to have a drink, which the latter refused. He then asked him what his business was, and McKnight replied he was handling Pontiacs in Evanston. Weisburg remarked that he would like

to buy a car, and McKnight said "Maybe we can do some business," upon which he claims McKnight said it would cost "three hundred dollars above the market," and upon which Weisberg said he replied "I thought we Jews were the only ones who knew how to make money that way. I didn't think the Irish would make it that way." Weisberg says McKnight became abusive. The bartender says that McKnight said "I don't want no part of you God damned Sheenies," and that he admonished him to quit using such language and to break it up and get out. The bartender then saw no more, as he walked away to attend to business.

Almost immediately after this, shots were heard and most of the people ran out of the tavern. There were three sailors in the tavern, one of them a chief machinist in the United States Navy, and two others, who were stationed upon another ship. They had met that night, and had to take rooms in a hotel together to get accommodations. They went to the Regent Room for dinner, and from there to the south end of the bar in the tavern. They were sitting down when the shooting occurred, the shots coming from the north end of the bar. The chief machinist testified he stood up and saw who was shooting and identified the defendant. He was shooting downward. "I saw another fellow. I saw one was lying on the floor behind the bar. He was crawling up the bar. The man I saw crawling was at the north end of the bar. The gun I saw was pointed toward the bar in the direction the man was laying or crawling. I thought I heard four shots in all." According to this witness, after the shooting started everybody left the room, and his companions left their coats and hats, "and after the shooting was over, we went back to get the hats. As I started to go into the place I saw Weisberg. I saw him put a gun away. He put the gun in his waist. Inside of the left side of his coat in around the breast. I could tell what kind of a gun it was from where I was standing. I would say it was a .38 revolver."

The testimony of one of his companions was to the same effect up to the time he heard the shots. He says he heard four shots and a scream and he got out of the place, but did not see who was shooting. He came back for his hat, and when he came back there was a man down at the other end of the room putting a gun away. He had the gun in his right hand and put it under his left arm, and somebody helped him with his coat. He identified the man with the gun as Weisberg. He heard a man groaning and went behind the bar to see if he could help him. He had had some experience in first aid. He was so employed when a policeman came in. "I heard some conversation between the man putting on the coat and Weisberg. I heard the man who put the gun away say 'I shot the son-of-a-bitch.' " To substantially the same effect was the testimony of the third sailor, except he does not mention the last remark.

The bartender, who told the deceased, McKnight, and the defendant to quit quarreling and get out, says that after he had talked with them he turned around to take care of some business, and heard two shots, and that he ducked down behind the bar. He also testified that a half minute or a minute before the shots were fired he had seen McKnight give Weisberg a general frisk, that is, he ran his hands over the clothes of Weisberg from the front and sides and hips. Other than this, on the part of the prosecution, there was no evidence of any assault upon the defendant by the deceased.

The evidence of the coroner's physician disclosed the deceased had been hit three times by .38 bullets, one of them entering the back about three inches below the border of the left shoulder about four inches to the left of the spine, and emerging about two inches to the left of the location of the entrance wound; another had entered the right leg from the outside and emerged on the inner part of the leg; the third bullet entered the right pubic area

near the junction of the fold of the skin and the abdomen and perforated the intestines at three different points. The bullet traveled upward toward the liver, and there was a through-and-through perforation of the spleen and perforated diaphragm on the left side. The bullet entered the pleural cavity, perforated the lung, and passed out between the ninth and tenth ribs. No bullets were found in the body. Upon examination, two bullet holes were found in the garbage container near the north door of the bar. There was another hole in the door about eight inches below its top level.

The only witness on behalf of the defense was Weisberg. His story does not materially differ as to what occurred up to the time of the shooting. After the conversation between them above narrated he says the deceased sort of put his hands over him and felt his body and hips. "I looked at this man and saw a pistol facing me, and with that he took me and felt me and with that I sort of caught his arm and I said, 'Please don't Joe.' I grabbed the gun, and we tussled there and I heard reports. McKnight had the pistol right close to my stomach. I grabbed his hand. Before that McKnight said, 'I am going to kill you.' Then the two reports came, and we were wrestling, I probably tripped him and there were more reports, and as he was falling there were two reports. I had the revolver in my hand. Shots were fired by me as he was falling. After the shots had been fired I remained there at the bar. I stayed there for a few minutes. I walked in the dining room. I put the gun in my pocket. I opened the door and walked out through the La Salle street entrance, and I threw the gun in the alley. I caught a cab. As I got out of the cab and walked through the door to the St. Clair Hotel, I was arrested."

Weisberg denied he had a gun, and that he had any intention of shooting NcKnight; and denied he had made the remark testified to by the sailor. Two of the wit-

nesses for the State testified he put the gun in a holster, or inside of something under his left arm. Defendant on the other hand testified he had no holster, and that the gun was a short-barreled one which he put in his vest pocket. The two sailors accompanying the chief machinist were taken to the police station, and told the officers they· could not identify the defendant, and on trial gave as their excuse that they were on leave to visit their families and did not want to be detained. The evidence shows also their expenses were paid to come to the trial from their respective stations.

The plaintiff in error, although assigning twenty-five or more errors, argues only the following: (1) The offense could not have been greater than manslaughter; (2) the prosecutor made improper arguments; (3) there was other improper conduct upon the part of the prosecutor; (4) the list of witnesses was not given the defendant in ample time; (5) the court gave erroneous instructions upon the part of the People and refused proper instructions upon the part of the defendant.

We will consider first the failure of the People to have endorsed upon the indictment the names of all of the witnesses, or to give to the defendant a list of all of the witnesses in writing before the time of the trial. The defendant was not furnished with the names of three State witnesses until after the jury was selected. It appears from the record that the assistant State's Attorney in charge of the case knew long in advance of the trial the names of these witnesses and their whereabouts. They were not before the grand jury, and their names were not endorsed upon the indictment. Numerous demands were made by defendant's counsel for the State to disclose all ot the witnesses, but by evasion, or denial of the existence, or refusal, the names of these three witnesses were withheld from the defendant's attorney until the trial commenced.

The statute (Ill. Rev. Stat. 1945, chap. 38, par. 729,) provides: "Every person charged with treason, murder or other felonious crime, shall be furnished, previous to his arraignment, with a copy of the indictment, and a list of the jurors and witnesses." In our opinion the attorneys for the People clearly attempted to evade this provision of the law, and prevented counsel for the defendant from talking with such witnesses, or from ascertaining facts about them which might affect their credibility. Obviously, this statute was adopted to prevent surprise and give defendant an opportunity to combat false testimony. However, this action of withholding names of witnesses against the defendant until the beginning of the trial is not alone sufficient to reverse a judgment. When the names of these witnesses were disclosed the defendant was furnished with statements they had made to the police shortly after the homicide was committed, and was given the opportunity to talk with them, although they refused to discuss the testimony they would give. The defendant did not ask for a continuance, nor did he do anything else to show he was prejudiced by failure to receive such names earlier, and proceeded with the trial.

More than twenty-five Illinois cases are cited by defendant to substantiate the proposition this was reversible error. Substantially half of these cases involved convictions of murder. From *Gardner v. People*, 3 Scam. 83, to as late as *People v. Nixon*, 371 Ill. 318, we have held without exception that it is within the discretion of the court to allow witnesses to testify whose names are not endorsed upon the back of the indictment, or included in the list of witnesses furnished by the People, and the exercise of that discretion will not be reviewed unless it appears the defendant has been taken by surprise, and the burden of showing this is upon the defendant. The following homicide cases cited by defendant adhere to the same rule: *Gardner v. People*, 3 Scam. 83; *Perry v. Peo-*

*ple,* 14 Ill. 496; *Scott* v. *People,* 63 Ill. 508; *Parteet* v. *People,* 70 Ill. 171; *Smith* v. *People,* 74 Ill. 144; *Logg* v. *People,* 92 Ill. 598; *Kota* v. *People,* 136 Ill. 655; *Gifford* v. *People,* 148 Ill. 173; *Trask* v. *People,* 151 Ill. 523; *Gore* v. *People,* 162 Ill. 259; *Kirkham* v. *People,* 170 Ill. 9; *Bolen* v. *People,* 184 Ill. 338; *Cross* v. *People,* 192 Ill. 291; *People* v. *Lutzow,* 240 Ill. 612; *People* v. *Steinhauer,* 248 Ill. 46; *People* v. *Strosnider,* 264 Ill. 434; *People* v. *Curran,* 286 Ill. 302; *People* v. *Bundy,* 295 Ill. 322; *People* v. *Corder,* 306 Ill. 264; *People* v. *Rongetti,* 331 Ill. 581; *People* v. *O'Hara,* 332 Ill. 436; *People* v. *Wolf,* 334 Ill. 218; *People* v. *Oberlin,* 355 Ill. 317; *People* v. *Schneider,* 370 Ill. 612; *People* v. *Nixon,* 371 Ill. 318. The reason underlying this rule is that the People as well as the defendant are interested in the enforcement of the law, and, as frequently stated, to deprive the trial judge of this discretion might result in great injustice to the People, as, in the event of an adverse verdict, they cannot obtain a new trial, while, on the other hand, the defendant not only may obtain a new trial, but. may have his case reviewed upon writ of error. The defendant is not in position to claim error on this ground.

No instruction defining manslaughter was given by the court, and no form of verdict for manslaughter was given. This is claimed to be error. The defendant did not offer an instruction on manslaughter, nor a form of verdict to be given to the jury. It is not the duty of the trial court to give instruction of its own motion, and if the defendant wishes certain instructions of the court to be given to the jury he should offer them, and if the court refuses proper instructions he has his remedy. (*People* v. *Savant,* 301 Ill. 225; *People* v. *Lucas,* 244 Ill. 603; *Dunn* v. *People,* 109 Ill. 635.) Defendant cites *People* v. *Pursley,* 302 Ill. 62, and *People* v. *Papas,* 381 Ill. 90. In both of these cases an instruction for manslaughter was offered by the defendant and refused by the court, and convictions **in**

these cases were reversed because there was evidence introduced, which, if believed, would have warranted a manslaughter verdict. The general statement contained in the cases, that a manslaughter instruction should be given where there is evidence justifying it, must be understood in the sense the duty exists when such instruction is offered by either side, when the circumstances justify it, but does not apply to cases where no instructions for manslaughter are offered in the case. The failure to give an instruction for manslaughter where none was tendered is not error.

Defendant seriously objects to instruction No. 5, which reads as follows: "You are further instructed that if you believe from the evidence beyond a reasonable doubt that the defendant, Julius Weisberg, with malice aforethought, either expressed or implied, made an assault with a deadly weapon upon Joseph McKnight, with intent to kill the said Joseph McKnight, in manner and form as charged in the indictment, not in self-defense as the same is defined in these instructions, then the jury should find the defendant, Julius Weisberg, guilty." It is claimed the language of this instruction amounts to a direction to the jury to find the defendant guilty of murder. Although it does not conclude with "guilty of murder," the objection to this instruction is based upon the theory the indictment charges murder, and only forms of verdicts in case of murder were given, and nothing said about manslaughter, or other elements which distinguish murder from justifiable homicide, hence the jury would interpret it to mean "guilty of murder."

In the first place this instruction does not direct that there should be a verdict of guilty of *murder*. The word "murder" is omitted from the instruction. In *Steiner* v. *People,* 187 Ill. 244, an instruction in quite similar language concluded with the direction to find the defendant guilty of *murder,* and it was held to be erroneous. In that case the words "not in self-defense as the same is defined in

these instructions" were not present. These words were present in the instructions given in *Carle* v. *People,* 200 Ill. 494, and an instruction almost identical with the one here involved was approved, although it concluded with the direction "then the jury should find the defendant Carle guilty of murder." This case goes on to say such an instruction is good, because if all of the elements of murder are stated and believed by the jury, the law does not authorize a conviction for a less offense, although the jury may exercise the power given it to so convict.

In *Crowell,* v. *People,* 190 Ill. 508, the *Steiner case* was distinguished, and the court discussed a similar instruction in a former holding, *Panton* v. *People,* 114 Ill. 505. That instruction had concluded with a direction to find the defendant guilty of murder, and the court, in the *Panton case,* in reversing the trial court, said: "Under an indictment for murder a defendant may be found guilty of manslaughter, and the jury, here, should have been left free to find in that respect, without being directed by the court how they should find. The court should have said no more in such respect in the instruction than that the jury should find the defendant guilty." This distinction received the express approval of the court in the *Crowell case.*

In the present case there was no direction to find defendant guilty of murder, and therefore giving the instruction was not reversible error. It is also said this instruction misled the jury in not defining self-defense. Instructions Nos. 15, 16 and 17 fully covered the element of self-defense, and with these in the series the jury could not have been misled into believing the defendant could be found guilty, even though the proof showed he shot in self-defense.

Instruction No. 8 objected to is as follows: "The court instructs the jury, as a matter of law, that if you believe from the evidence, beyond a reasonable doubt, that the defendant committed the assault as alleged in the indict-

ment, and if you further find from the evidence in this case, beyond a reasonable doubt, that such an assault was committed deliberately and was likely to be attended with dangerous consequences, the malice, or intent, requisite to make out the case as charged will be presumed." It is claimed that this instruction ignores self-defense. We are referred to. *People* v. *Durand*, 307 Ill. 611, as supporting this theory. The full instruction in that case is not set out in the opinion, but it is stated to have said, in substance, to constitute malice "it is enough if the intention to commit the act, with a full appreciation of the result likely to follow, was present at the time the act was committed, and that the act was not the result of some sudden heat of passion, * * *." In that case substantially all of the instructions given on behalf of the People were said to be incorrect, and especially those upon self-defense, and it was concluded by the court that in a state of the record where the law with regard to self-defense was not correctly stated elsewhere, the effect of the instruction was to say that if the defendant intended to kill, even in self-defense, malice would be proved. And for this and other errors the cause was remanded. The case came to this court a second time in 313 Ill. 582, and although there was some error in the trial of the cause, we held if the law of the case was fully presented it would not be reversed because an instruction did not contain all of the law on the subject, unless the peculiar circumstances of the case rendered such an instruction misleading.

In the present case, nobody contends the jury was not instructed upon the law of self-defense. Instruction No. 8 did not direct a verdict. We have frequently held that instructions defining murder, malice, and malice aforethought, and which do not direct a verdict are not erroneous as ignoring self-defense, where other proper instructions are given upon that subject. When the instructions are read as a series they neither ignore nor nullify the theory of

self-defense. *People* v. *DeRosa,* 378 Ill. 557; *People* v. *Turner,* 385 Ill. 344; *People* v. *Gibson,* 385 Ill. 371.

Instruction No. 9, given on behalf of the People, pointing out the limitations of self-defense, among others, covered the law upon a theory "that the defendant sought or brought on a difficulty with the deceased at the time of the shooting," and other language indicating the law applying to the aggressor. The objection is, there was no evidence to justify the inference the defendant had brought on the difficulty. We think there was sufficient evidence offered in the case to leave this question to the jury. The only thing appearing in the State's evidence indicating the deceased was the aggressor was the language he used, and the frisking claimed to have taken place.

The eyewitnesses testified to seeing the deceased lying on the floor, and the defendant shooting at him. It is true the defendant narrates a state of facts which would negative this, but all of the evidence was open to consideration by the jury, to determine whether or not the defendant brought on the difficulty, and the State should not be limited in presenting this view to the jury. The other side of this proposition was presented to the jury in defendant's instruction No. 15, where it was told that if the defendant was assaulted in such a way as to bring on a reasonable belief that he was in danger of losing his life or suffering great bodily harm, he was justified in defending himself, even to the extent of killing his adversary. There could be no possible injury to the defendant by the People's instruction. Neither *People* v. *Turner,* 385 Ill. 344, nor *People* v. *Gibson,* 385 Ill. 371, support this claim that the instruction was error, but, as said in the latter case, "The theory of the prosecution was that the defendant was the aggressor on the occasion * * *. There was evidence tending to support that theory, and the giving of the instruction was not error." An instruction quite similar was given in *People* v. *Autman,* 393 Ill. 262, and held not error.

Instruction No. 10 is claimed to be error because it, in effect, says that before a person is justified in using a deadly weapon, and using it in a deadly manner, it must appear to him as a reasonable man that he was in imminent peril of death or of great bodily harm. The objection is to the use of the words "resorting to a deadly weapon," and it is claimed there is an inference the defendant brought the weapon to the scene, and was free to use it or not. We do not draw this inference from the instruction. It is based upon the People's theory that the defendant used the deadly weapon without sufficient justification, as a reasonable man. There was evidence to support the People's theory. The defendant's theory was amply covered by instructions Nos. 15, 16 and 17, where the exercise of the right was fully and accurately defined.

Plaintiff in error makes certain objections to instructions Nos. 4, 6 and 7, because they are abstract propositions of law. He says he would not complain of these instructions if it were not a capital case. The law is the same in all homicide cases without regard to what punishment the jury may fix. Instruction No. 4 is a definition of murder and malice as defined by the statute. (Ill. Rev. Stat. 1945, chap. 38, par. 358.) We are referred to *People* v. *Clark,* 368 Ill. 183. In this case it is held such an instruction is objectionable, unless the element of self-defense is referred to. In the series of instructions given in the present case self-defense is presented several times. We pointed out above that all of the law need not be set out in one instruction. No verdict was directed by this instruction. In *People* v. *Grady,* 381 Ill. 224, we held a like instruction did not nullify self-defense.

Instructions Nos. 6 and 7 refer to what constitutes malice, and are taken from the language of the statute. They were given upon the theory defendant became angry, and killed the deceased without any reasonable ground to fear bodily harm or death. In his instructions defendant

presented the law as to when a person assaulted is entitled to kill in self-defense. If the right to self-defense existed, malice was necessarily negatived, because if the killing was in self-defense it could not be with malice, however intentional the killing may have been. The series of instructions clearly discloses the law on the subject.

Instruction No. 11 was given upon the theory that the defendant had fled, and told the jury that flight was a proper circumstance to be considered in determining the guilt or innocence of the defendant. We do not think this instruction should have been given in this case. The defendant left by the back door of the restaurant adjoining, and about a half hour later, while entering the hotel in which he lived he was arrested by the officers. The People point out the pistol he had in his hand was thrown away by him. Throwing away a pistol does not prove flight. The most natural evidence of flight would be to go in a different direction than toward his home. It seems the prosecutor thought, and argues, it is the duty of the defendant, whether guilty or innocent, to either remain upon the scene of the homicide, or to surrender to a policeman. We have not been cited to, nor do we know of, any law requiring this upon the part of a man who has killed another, as he claims, in self-defense. This instruction should not have been given, but we do not see where it could have reasonably affected the verdict. Surely, any jury could distinguish between going home, and fleeing to escape arrest. Under a similar situation we held it could not be said that such an instruction constituted reversible error. *People* v. *Haensel,* 293 Ill. 33.

It is claimed the assistant State's Attorney improperly referred to another notorious crime in his argument, and thus improperly prejudiced the jury. The language objected to in the argument is as follows: "Mr. Devine mentioned about the Degnan case, that terrible murder of that little girl that is being investigated every day, and ladies

and gentlemen of this jury, if the perpetrator of that crime was being charged here in this same court room and you were the same jury, before you get out of here you would hear the same kind of a story you have heard here trying the State's Attorney. Try this one, fog the issues, and when this little Degnan girl's killer is brought to trial, I want each one of you to come into the court room and listen to the defense counsel when they are arguing to the jury, I want you before your jury service is up, two weeks or three weeks from now, whichever it is, to listen to each one of the arguments that are made," at which point upon objection of defendant's counsel the court advised the State's Attorney not to persist any further.

In the opening argument for the defense, defendant's attorney, among other things, said: "Grant [People's attorney] tries to tell you, ladies and gentlemen, 'Why don't you see the first police officer and say, "I am the guy." ' People don't do that any more. When you pick out the arrests in the Degnan case, they get lawyers first, they don't take a chance." When this remark of the defendant's counsel is taken into consideration, it is perfectly clear the argument complained of was in reply to what he had opened up with. The previous remarks of this attorney for the defendant suggest he was trying to divert the attention of the jury from the evidence to the attitude of the prosecuting attorney. He is not to be criticized for this, but cannot be permitted to use the reply as ground for claiming error if what he says provokes an improper reply. Among these remarks of the defendant's attorney the State's Attorney was accused of unfairness. There is an inference contained in the words "you would like to know what transpired between Grant and those witnesses. Grant is the State's Attorney here, he has a license to practice law, but no, he is a police officer too." He then comments upon what Grant supposed the conversation might be between the defendant and the deceased, and says "he

is trying to guess you into the penitentiary;" and further on accuses the State's Attorney of misleading the jury with respect to the number of shots, and finally wants to know why the State's Attorney did not produce the clothing to show the condition of the powder burns. All of these remarks preceded the remarks concerning the Degnan case.

We are of the opinion that while the mention of the Degnan girl in the State's Attorney's remarks could have better been left unsaid, it had nothing to do with the crime in that case nor the punishment that should be given, but was only in reply to the accusation of the defense attorney as to the State's Attorney's unfairness. He invited the jury to come in and watch the trial of that case, if it ever came up, and said the jurors would observe the defense attorneys would do the same thing in that case as he contended they were doing in the present one. It has been very frequently held an attorney for the defendant cannot provoke a reply to his own improper argument and then claim error. *People* v. *Fricano,* 302 Ill. 287; *People* v. *Fricker,* 320 Ill. 495.

There are a number of other remarks made by the State's Attorney claimed to have been improper and erroneous, to which no objection was made, and no exception taken. Errors cannot be assigned on arguments unless objections are made to the same in the course of the argument, and ruled upon by the court. *People* v. *Anderson,* 239 Ill. 168.

It is finally contended by defendant that there is no material dispute in the facts, and that such facts established no more than manslaughter. We do not agree that the disagreement in facts is immaterial. The defendant admits the killing. His narration of facts leaves it doubtful whether the killing was in self-defense or accidental, either of which, of course, would justify his acquittal. Evidence upon the part of the prosecution would justify the jury in

believing a quarrel arose between two partly intoxicated men; that one referred to the other in terms of racial disparagement; that the other had on his person a pistol, which he used to kill the other by shooting him in the back, or by holding the gun at waist level, and still kept shooting while the deceased was almost in a prone position on the floor. There is no claim any assault was made other than passing the hands over the clothing, and no threats are mentioned except by the defendant; nor is any provocation shown on the part of the People's evidence other than the insulting language.

The jurors had the province of weighing the testimony; they had a right to determine whether they would believe that the defendant would be deterred by perjury in a case where the punishment for murder was so much more severe. They had a right to determine from the evidence whether the pistol belonged to the deceased or to the defendant, and to take into consideration that it was lost, or thrown away, because the defendant might fear it could be shown to belong to him. They had a right also to take into consideration that the three eyewitnesses had their carfare paid from distant points, and that two of them had made different statements to the police shortly after the homicide. They also had the right to take into consideration the reason given by the witnesses for not telling the police all they knew for fear of being detained on their way home for furloughs. The jurors also doubtless considered the truth of the defendant's statement that he, a man of medium size, wrested from a large and powerful man a pistol which was already turned towards defendant, and succeeded in killing the assailant with the latter's own weapon.

These contrasting sets of facts do present materially different situations upon consideration of which the jury disregarded the defendant's testimony and believed that of the People, and we will not, upon such a conflicting

state of evidence, overrule the verdict of the jury, unless error supervened in the trial of the case to prejudicially influence the jury's verdict. The rule is settled that the verdict of a jury will not be disturbed where the evidence is merely conflicting, if the evidence is otherwise sufficient to establish the guilt of the defendant beyond a reasonable doubt. (*People* v. *Thompson,* 321 Ill. 594; *People* v. *Price,* 371 Ill. 137; *People* v. *Tamborski,* 356 Ill. 11.) This rule has been applied in capital cases. *People* v. *Price,* 371 Ill. 137; *People* v. *Martellaro,* 281 Ill. 300.

We have held, however, that evidence will be closely scrutinized where it is conflicting, if incompetent evidence creeps in, (*People* v. *Rogers,* 348 Ill. 322;) or where there is misconduct upon the part of the prosecuting attorney, (*People* v. *McLaughlin,* 337 Ill. 259;) or if there are other circumstances during the trial of the case which might have the effect of diverting the jury from considering the competent evidence. *People* v. *Gordon,* 344 Ill. 422.

We have considered all the errors claimed by defendant. We have found the instructions given to the jury were proper; that there was no error in the argument to the jury; that there was no error of the court in failing to give instructions on manslaughter; and there is no substantial showing that improper or incompetent evidence was introduced. This being true, there is nothing upon which the court can intervene to overturn the verdict of the jury upon evidence which is merely conflicting.

In a trial for murder it is peculiarly within the province of a jury to fix the punishment in case the defendant is found guilty. (*People* v. *Martellaro,* 281 Ill. 300; *People* v. *Bolton,* 365 Ill. 39; *People* v. *Lehne,* 359 Ill. 631.) The evidence in this case upon the part of the People, if believed by the jury, amply demonstrated the guilt of the defendant, and it was within its province to fix the penalty. We think the evidence in this case establishes the

guilt of the defendant beyond a reasonable doubt, and that we would not be warranted in overturning the verdict of the jury upon the evidence in this case.

The judgment of the criminal court of Cook county is, accordingly, affirmed. It is the judgment of the court that the original sentence of the criminal court of Cook county shall be executed on the 28th day of March, 1947, and the clerk of this court is directed to enter an order to that effect, and furnish a certified copy of such order to the sheriff of Cook county at least ten days prior to the date of execution. *Judgment affirmed.*