[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 17 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 18 
The defendant Charles Stewart was indicted for resisting arrest and the defendant Wesley Mitchell was indicted for interfering with a police officer and assault and battery; thereafter writs of certiorari were allowed and motions were made to the former Supreme Court to quash the indictments; the causes were transferred to this court pursuant to Article 11, Section 4,paragraph 8 of the Constitution of 1947.
The defendant Charles Stewart was employed as an hourly rated machine operator by the Phelps Dodge Copper Products Corporation. He was a member of Local 441, CIO, and went out on strike with his union; on January 18, 1946, during the strike the incident for which he was indicted occurred; the indictment was returned on June 20, 1946; he was arraigned on June 27, 1946, served notice of application for writ of certiorari on August 8, 1947, and obtained his writ on January 29, 1948. The defendant Wesley Mitchell was employed as an hourly rated test pump operator by the same employer; he was a member of the same union and likewise went out at the time of the strike; he was indicted for an incident which occurred on July 27, 1946; the indictment was returned on December 11, 1946; he was arraigned on December 20, 1946, served an original notice of application for writ of certiorari on April 9, 1947, which was denied by a single justice [see State v. Blusewicz and Mitchell, 135 N.J.L. 591 (Sup.Ct. 1947)], served a further notice of application for writ on August 8, 1947, and obtained his writ on January 29, 1948. The defendant Stewart is white and the defendant Mitchell is colored. On February 24, 1948, the defendants served notices of motions for leave to withdraw their not guilty pleas and *Page 19 
quash the indictments primarily on the ground that hourly paid wage earners and colored persons had been deliberately and intentionally excluded from the grand juries which indicted them. On February 25, 1948, the court granted leave to withdraw the pleas, noted the motions on the record and permitted the taking of depositions.
In the course of their depositions the defendants did not call any witnesses or otherwise seek to establish affirmatively how the members of the grand juries were selected. Instead, after taking the testimony of the defendants as to their occupations and color, they then proceeded to call the persons listed on the grand jury panels from 1942 through 1946 to ascertain their occupations and color. Various evidential questions arose which were ruled upon by the former Supreme Court. At the argument counsel for the defendants conceded that these rulings by the former Supreme Court established the law of the case and may not now be reviewed by this court. Several hundred persons who were on the grand jury panels from 1942 through 1946 testified as to the nature of their work and their color, stipulations between the parties with respect to others who were not called to testify were made part of the record, and compilations by the Department of Labor and the Department of Commerce classifying the persons listed on the grand jury panels in accordance with their major occupational status were introduced in evidence along with schedules comparing the occupations of employed persons in Union County with those listed on the grand jury panels and tables listing the negroes who served on the grand jury panels and comparing the percentages of negroes in the County with the percentages of negroes listed on the panels. The State contends that this proof by the defendants is insufficient to establish their charge of intentional exclusion of wage earners and negroes and that their motions should be denied on that ground as well as for the additional reason that their proceedings were instituted out of time. *Page 20 
 I The Timeliness of the Defendants' Applications. R.S. 2:189-7 provided for the allowance of a writ of certiorari to remove an indictment, at the instance of an indicted person "within three months after the entry of any plea". Stewart did not move for his writ until well over a year from the date of his plea and Mitchell did not move until over three months after his plea. No justification has been advanced for the delay. The public interest demands that unnecessary delays in bringing indictments to trial be eliminated and the three months statutory limitation as applied to the facts presented appears wholly reasonable. Cf. Red Oaks, Inc. v.Dorez, Inc., 117 N.J.L. 280 (Sup.Ct. 1936); Peckitt v.Board of Adjustment, 136 N.J.L. 405 (Sup.Ct. 1948). Under these circumstances the relief sought here by the defendants might well be denied and their writs dismissed without more. However, in view of the serious nature of the charges and the public importance of the questions presented, we shall consider the merits of the controversy.
 II The Alleged Exclusion of Wage Earners.
The defendants assert that the exclusion from grand jury panels of a particular economic group such as hourly rated wage earners would violate the law of New Jersey as well as constitutional principles announced by the United States Supreme Court. We find nothing in our State law or in the decisions of our State courts which deals expressly with the subject. The governing statute provides that grand jury lists shall be prepared with due regard for the "just distribution" of jury service among qualified persons. See R.S. 2:88-1. The legislature has not attempted to direct explicitly the sources from which grand jury lists are to be compiled or the precise manner in which they are to be prepared. Although our courts have stated that the lists must be prepared impartially and without a view towards securing *Page 21 
indictments [see State v. McCarthy, 76 N.J.L. 295 (Sup.Ct.
1908)], they have also stated that they will not substitute their own formula for that chosen by the jury commissioners in the absence of proof of "bad motive". See State v. Biehl,135 N.J.L. 268, 270 (Sup.Ct. 1947). In addition, they have announced the rule that the "statutory provisions respecting the preparation of lists and the drawing of the panel are regarded as directory only, and that irregularities therein are no ground of challenge, unless they are such as plainly operated to prejudice the challenging party." See State v. Simmons, 120 N.J.L. 85,88 (E. A. 1938); State v. Biehl, supra.
In Thiel v. Southern Pacific Co., 328 U.S. 217,90 L.Ed. 1181 (1946) the United States Supreme Court, after pointing out that the American tradition of jury trial "contemplates an impartial jury drawn from a cross-section of the community" and that prospective jurors should be selected without systematic and intentional exclusion of any qualified groups, economic or otherwise, upset a petit jury's verdict in a lower federal court, without any showing of actual prejudice, on the ground that all daily wage earners had been intentionally excluded from the panel. The decision was not rested on constitutional requirements applicable to state courts, but represented an exercise by the Supreme Court of its supervisory control over the administration of justice in the federal courts. In the light of the later decision in Fay v. New York, 332 U.S. 261, 91 L.Ed. 2043
(1947), sustaining a "blue ribbon" jury's verdict and the division among the Supreme Court Justices, the question as to whether the comprehensive pronouncements of the Thiel case will be subsumed within the 14th Amendment to control State proceedings may not be answered with any assurance. In any event, for present purposes it is sufficient to point out that in theFay case the court held that the defendant there making the charge of exclusion of an economic class had not met the exacting burden of proving it and had not made the showing of prejudice which was required.
In the case before us the proof was of the same type although less impressive than that held insufficient in the Fay *Page 22 
case. Although the defendants urge that the grand jury panels were weighted in favor of proprietors and supervisory employees, they do not now contend that any economic segment of the population was entirely excluded. On the contrary, examination of the testimony discloses a rather complete cross-section of an American community, including the bank official, teller and clerk, the teacher, librarian, nurse and stenographer, the doctor, dentist, accountant, druggist and optometrist, the big business proprietor, the plumbing contractor, carpenter, butcher and barber, the corporate executive, the confectionary store owner, tavern keeper, and service station operator, the meter reader, toolmaker, machinist, waitress, bricklayer and cook, the union business agent, insurance claim agent, real estate broker, the assembly line worker, and others too numerous to list here. On the other hand, it does appear that the aggregate of the craftsmen, operators, service workers, and laborers which might be joined under the general description of daily wage earners have been listed infrequently in contrast to the groups which have been classified as proprietors and managers, professional workers, clerical workers and housewives. Thus, the defendants' tables tend to indicate that in the May and October, 1946 jury panels the daily wage earners group aggregated less than 4% in contrast to a stated population of 29%, whereas 47% of the proprietor group were listed though they had only a stated population of 5%. The State's tables indicate that of 639 members of the grand jury panels, slightly less than 10% might be classified within the daily wage earners group and almost 45% within the proprietor group. In the Fay case it appeared that 43% of the 2700 jurors listed in the blue ribbon panels were in the proprietor group with a stated population of less than 10% and that only .2% of the jurors would fall within the defendants' classification of daily wage earners with a stated population of over 57%.
The defendants have made no attempt to call any persons who participated in or had knowledge of the preparation of the grand jury lists and they have failed to furnish us with any affirmative evidence whatever as to how the lists were drawn. We are left to speculate whether the lists resulted *Page 23 
from questionnaires or were taken from tax records, telephone directories, organizational lists, or otherwise. Perhaps the jury commissioners, in an honest exercise of their judgment, selected only those having a complete grade school education or higher which might have a greater effect on the daily wage earner group than on others. Other possibilities may be explored but no useful purpose would be served. The defendants have in nowise carried their burden by proving a lack of proportional representation without any showing that it resulted from deliberate action designed to that end. Not only have the defendants failed to introduce anything relating directly to the manner of selection, but in addition, they have confined their proof with respect to the daily wage earner group to population figures without any evidence as to their qualifications for jury duty. We, of course, assume that a substantial number of them are qualified; nevertheless, we are satisfied that the evidence before us falls far short of the clear proof required to overcome the recognized presumption that the public officials have acted within the bounds of their legal authority and in the proper exercise of their discretion in selecting persons for listing on the grand jury panels.
In addition to their omission of proof vital to their charge of discrimination, the defendants made no attempt to prove that the manner in which the panels were drawn operated to prejudice them. There is no suggestion that the 1946 panels were deliberately drawn either with knowledge of the strike or with reference to incidents resulting therefrom. On the contrary, the defendants' contention is that they were drawn in the same manner as grand juries have been drawn for many years past. Similarly there is no suggestion that any member of the panels was individually prejudiced for or against labor union members or daily wage earners. It does not appear how many jurors were union members, although one witness did testify on cross-examination by the State, that she served on the October 1946 grand jury, which indicted the defendant Mitchell, but asked to be excused from participating in his case because, as she expressed it, "I was a worker myself and I belonged to a union. So it was fitting that I should be *Page 24 
excused." The record is barren of any denial that the defendants were afforded fair and impartial consideration by the grand juries which indicted them, and will in due course receive fair trials before petit juries. Their contention that no showing of prejudice was necessary in support of their charge of discrimination against daily wage earners is not sustained by the decisions and is without merit. See State v. Simmons, supra;State v. Biehl, supra; Fay v. New York, supra.
 III The Alleged Exclusion of Colored Persons.
The motion to quash the indictment against Mitchell, a colored person, is rested on the additional ground that in the selection of the grand jury which indicted him, colored persons were purposefully excluded or discriminated against because of their color. The controlling principles under the 14th Amendment and pertinent Acts of Congress (8 U.S.C.A. Sec. 44) and our State legislature (R.S. 10:1-8) are well recognized. Although no colored defendant has the right to insist that persons of color actually serve on the jury or that they have proportional representation in the jury panel, he does have the unqualified protection that in the drawing of jury panels, grand or petit, there must be no intentional discrimination against persons because of their color. See Norris v. Alabama, 294 U.S. 587,79 L.Ed. 1074 (1935); Hill v. Texas, 316 U.S. 400,86 L.Ed. 1559 (1942). See also Johnson v. State,59 N.J.L. 271 (Sup.Ct. 1896) aff'd. 59 N.J.L. 535 (E. A.
1896). And unlike the case of discrimination against an economic class, proof that colored persons were systematically excluded or discriminated against in the drawing of the grand jury is sufficient under the federal Constitution and the Act of Congress to compel quashing the indictment without any further showing of actual prejudice. See Mr. Justice Jackson's comment inFay v. New York, supra:
"Nor is there any such persuasive reason for dealing with purposeful occupational or economic discriminations if they do exist as presumptive constitutional violations, as would be the case with regard to purposeful discriminations because of race or color. We do not *Page 25 
need to find prejudice in these latter exclusions, but cf.Strauder v. West Virginia, 100 U.S. 303, 306-309,25 L.Ed. 664, 665, 666, for Congress has forbidden them, and a tribunal set up in defiance of its command is an unlawful one whether we think it unfair or not. But as to other exclusions, we must find them such as to deny a fair trial before they can be labeled as unconstitutional."
The evidence presented on Mitchell's behalf does disclose some lack of proportional representation but the issue is whether he has carried his admitted burden of establishing that this resulted from willful exclusion of persons because of their color. Here again no affirmative proof was offered as to how the grand jury lists were prepared. Instead, the defendant directed his proof mainly to establishing that the percentage of negroes of Union County twenty-one years and over as shown by the 1940 census was 5.4% and that during the period from 1942 to 1946, inclusive, negroes constituted 1.7% of three panels, 1% of two panels, .7% of two panels, and .3% of eight panels. No attempt was made to establish what percentage of the negro population of the County would meet the statutory requirements of citizenship and residence, ability to read and write, and freedom from physical disability or conviction of crime. The State points out that if more than an eighth grade education was used as a standard by the jury commissioners, the percentage of qualified negroes would be less than 3% of the available jury population. If the selection was in good faith made on the basis of questionnaires properly distributed, the resulting lack of proportional representation would not, in any sense, indicate unlawful discrimination. Similarly, if the jury commissioners availed themselves of proper sources such as tax records and telephone directories, disproportion might well result and still not suggest any deliberate exclusion or discrimination. As with the charge of exclusion of daily wage earners, the defendant has left us to speculate without attempting to furnish any affirmative evidence which might shed light on whether the disproportion resulted from intentional and deliberate discrimination or from wholly unrelated causes. We are satisfied that he has not carried the burden of his charge and has not overcome the presumed validity of the official action under attack. Cf. Akins *Page 26 v. Texas, 325 U.S. 398, 89 L.Ed. 1692 (1945) where the United States Supreme Court declined to make a finding of intentional discrimination where it appeared that one negro was placed on each grand jury panel in a community having 15% negro population, and People v. Price, 371 Ill. 137, 20 N.E.2d 61
(1939) cert. den. 308 U.S. 551 (1939) where the Illinois Supreme Court likewise declined to make such finding on a limited showing comparable, though more compelling, with that made by the defendant Mitchell.
Since we have concluded that the defendants' applications were not timely and that they have not carried the burden of establishing that the jury commissioners intentionally excluded persons from grand jury service because they were daily wage earners or persons of color or that they otherwise violated constitutional or statutory requirements, the motions to quash must be denied. We might, however, express the cautionary comment that officials charged with the high responsibility of preparing jury lists should be ever vigilant in vindicating our democratic philosophy that juries be truly representative of our community as a whole. This, of course, does not mean that each jury could or ought embody representatives of all groups. It does mean that each jury is to be selected without systematic or intentional exclusion of any qualified group and that whenever it appears that large segments of our population, fully qualified and not exempt by law, are not being called for jury service, whatever be the cause, corrective steps should be taken.
 The motions are denied and the writs dismissed. *Page 27